2000 ME 102

**DAVRIC MAINE CORPORATION**

v.

**BANGOR HISTORIC TRACK, INC., Ival Cianchette and State Harness Racing Commission.**

Supreme Judicial Court of Maine.

Argued May 3, 2000.

Decided May 26, 2000.

Edward S. MacColl (orally), Thompson, Bull, Furey, Bass & MacColl, LLC, P.A., Portland, for plaintiff.

William B. Devoe (orally), Eaton, Peabody, Bradford & Veague, P.A., Bangor, for defendant Bangor Historic Track. Catherine R. Connors (orally), Peter W. Culley, Pierce Atwood, Portland, for defendant Ival Cianchette. Andrew Ketterer, Attorney General, John H. Richards, Asst. Attorney General (orally), Augusta, for defendant Maine Harness Racing Commission.

Before CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Davric Maine Corporation, the owner and operator of Scarborough Downs, appeals from a judgment entered in the Superior Court (Cumberland County, *Crowley, J.*) granting Bangor Historic Track's (BHT), Ival Cianchette's, and the State Harness Racing Commission's motion to dismiss Davric's appeal from a decision of the Commission as untimely. We affirm the judgment.

### I. FACTS

[¶ 2] On December 7, 1998, the State Harness Racing Commission issued its decision on licensing applications and race dates for the 1999 harness racing season. Prior to the decision, the Commission had held an adjudicatory hearing on November 19 and 20, 1998, to consider applications for licenses and race dates. At this hearing, all interested parties were allowed to intervene. The Commission reissued licenses to BHT and Scarborough Downs pursuant to 8 M.R.S.A. § 271 (1997).[1] In

---

1. Section 271(1) states in pertinent part:

    **1. Licensing.** If the commission is satisfied that all of this chapter and rules prescribed by the commission have been substantially complied with during the past year and will be fully complied with during the coming year by the person, association or corporation applying for a license; that the applicant, its members, directors, officers, shareholders, employees, creditors and associates are of good moral character; that the applicant is financially responsible; and that the award of racing dates to the applicant is appropriate under the criteria contained in subsection 2, it may issue a license for the holding of harness horse

its decision, the Commission issued live race dates to several tracks under two different headings, *"FAIRS AND EXTENDED MEETS"* and *"COMMERCIAL TRACKS."* BHT and Scarborough Downs were the only two entities granted live race dates under the *"COMMERCIAL TRACKS"* heading. Davric objects to the Commission's classification of BHT as a commercial track because the Commission never heard evidence to support a finding that BHT was a commercial track[2] and because BHT does not satisfy the requirements of 8 M.R.S.A. § 275–A. Section 275–A of Title 8 defines a commercial track as:

> 1. **Commercial Track.** "Commercial Track" means a harness horse racing track licensed under this chapter to conduct harness horse racing with pari-mutuel wagering that:
>
> A. If the population within the 50–mile radius of the track is 300,000 or more, conducted racing on more than 100 days in the previous 2 calendar years, except that if a racetrack that qualified as a commercial racetrack

---

races or meets for public exhibition with pari-mutuel pools, which must expire on December 31st.
8 M.R.S.A. § 271(1).

2. The record reflects no evidence was offered by Davric that it met the requirements to operate as a "commercial track." We note, however, that no challenge was made to Scarborough Downs' designation.

3. This section was recently amended by P.L. 1999, ch. 482, § 2, to clarify the definition of the 50–mile radius. The amended statute reads:
1. Commercial Track. "Commercial Track" means a harness horse racing track licensed under this chapter to conduct harness horse racing with pari-mutuel wagering that:
A. If the population of the region is 300,000 or more, based on the 1990 U.S. Census, conducted racing on more than 100 days in each of the previous 2 calendar years; or
B. If the population of the region is less than 300,000, based on the 1990 U.S. Census, conducted racing on more than 25 days in each of the previous 2 calendar years.

---

under this subsection goes out of business, one new racetrack opening in a location with a population within a 50–mile radius of the track of 300,000 or more qualifies as a commercial track if it races more than 100 days in a calendar year; or

> B. If the population within the 50–mile radius of the track is less than 300,000, conducted racing on more than 25 days in the previous 2 calendar years, except that if a racetrack under this subsection goes out of business, one new racetrack opening in a location with a population within a 50–mile radius of the track of 300,000 or less qualifies as a commercial track if it races more than 25 days in a calendar year.

8 M.R.S.A. § 275–A (1997 & Supp.1998).[3] Davric maintains that BHT does not fulfill the requirements of section 275–A(1)(B) because the population in the 50–mile radius is greater than 300,000.[4] BHT was issued 37 race dates for the 1999 season. Thus, the population of the 50–mile radius

---

For the purposes of this subsection, "region" is determined by measuring a distance of 50 miles from the center of the racing track along the most commonly used roadway as determined by the Department of Transportation, drawing a circle around the center of the racing track using the 50–mile measurement and excluding those municipalities or unorganized territories that do not have boundaries contained entirely by that circle.
8 M.R.S.A. § 275–A (Supp.1999). This clarified definition, which became effective on September 18, 1999, is retroactive to June 17, 1993. *See id.* (codifying P.L.1999, ch. 482, § 10). Because the Commission awarded BHT's license and race dates before the amendment was enacted and because we do not remand for a determination of whether BHT satisfies the definition of a commercial track, we need not discuss the applicability of the amended definition.

4. Neither party attempts to argue that BHT satisfies section 275–A(1)(A); the record indicates that BHT did not operate 100 live race dates.

of Bangor must be less than 300,000 for BHT to qualify as a commercial track pursuant to section 275(1)(B). Davric's concern over BHT's status as a commercial track arises out of the Commission's distribution of two monetary funds: (1) the Off–Track Betting (OTB) fund which proportionally distributes monies from wagers at off-track betting facilities to commercial tracks that provide simulcast transmission of live racing in Maine, *see* 8 M.R.S.A. § 295 (Supp.1999);[5] and (2) the Commercial Meet Account (CMA) which distributes a portion of the wagered money to "commercial meets" or "commercial licensees" proportional to the handles at each track. *See* 8 M.R.S.A. § 287(2) (Supp.1999).[6] If BHT lost its classification as a commercial track, Davric would receive a larger portion of the OTB and CMA funds because Davric and BHT are the only two commercial tracks in the state.

[¶ 3] The Commission, which concluded hearings for licensing and race dates on November 20, 1998, later reopened those hearings, under its unique rules, on discrete issues after receiving requests to address certain specific topics. On December 18th, Northern Maine Fair Association and BHT requested the Commission to reconsider its December 7, 1998 decision concerning their live race dates and BHT's request for simulcast wagering. On January 14, 1999, Davric asked the Commission to modify the conditions it imposed on Davric's license, to award additional race dates, and to stay the effect of conditions it imposed on Davric's license. In its letter dated January 14, 1999, Davric *did not* ask the Commission to reconsider BHT's designation as a commercial track. Davric first raised the issue of BHT's commercial track status on January 25, 1999, when it submitted a letter to the Commission stating that it had received information that the 50–mile radius surrounding BHT contained a population greater than 300,000 and, therefore, BHT did not qualify as a commercial track and was not

---

5. Section 295 states:

> **1. Payment.** Amounts calculated as off-track betting facility simulcast fund share under section 286 must be paid to the commission for distribution as provided in subsection 2.
>
> **2. Distribution.** On May 30th, September 30th and within 30 days after the close of all off-track betting facilities for the year, amounts payable under subsection 1 for distribution in accordance with this subsection must be distributed only for the dates assigned by the commissioner pursuant to Title 7, section 65 to the commercial racetracks and the agricultural fair associations that provide simulcast transmission of live racing in the State. Distribution must be in the proportion that the amount of wagers placed at off-track betting facilities on simulcast races from each licensee up to the last day of the preceding month bears to the total amount wagered at off-track betting facilities on races simulcast from all commercial racetracks and agricultural fair associations up to that date. The last payment of the calendar year must be adjusted to reflect each licensee's wagers in proportion to the total wagered at off-track betting facilities in that calendar year.

8 M.R.S.A. § 295.

6. Section 287 states in relevant part:

> **2. Commercial meet account.** The Treasurer of State shall deposit in a commercial meet account 72% of the revenue credited to the General Fund under this section that is attributable to amounts in excess of $35,000,000. This account must be divided in the proportion that the contributions of regular and exotic wagers of pari-mutuel pools on live racing made or conducted at the commercial meets of each licensee during the calendar year bear to the total contributions of regular and exotic wagers to pari-mutuel pools on live racing made or conducted at the commercial meets of all licensees during that calendar year. Licensees sharing in this distribution shall use ½ of the funds received for the purpose of supplementing purse money. The other ½ of this distribution must be paid to the commercial licensees as reimbursement for improvements made to their racing facilities in the calendar year during which the funds are generated. To receive reimbursement, commercial licensees must submit plans for the improvements to the commission and receive approval from the commission prior to making the improvements, and the commission must verify that the approved improvements have been made.

8 M.R.S.A. § 287.

entitled to monies distributed from the CMA or OTB funds.

[¶ 4] The Commission held a hearing on February 25, 1999, to discuss Davric's ability to meet the conditions imposed upon it. The Commission also allowed Davric to raise the issue of BHT's status as a commercial track for the limited purpose of helping the Commission to determine whether it needed to reopen the race date hearings. If BHT's commercial track designation was in jeopardy, the Commission would have to reopen the race date hearings and grant Davric more race dates; otherwise, race tracks in Maine would not be allowed to hold simulcast racing in the 2000 race year. Chapter 11 of Title 8—the chapter which governs harness racing—requires commercial tracks in the state to hold a total of 150 live race dates per year before the Commission may allow simulcast racing. *See* 8 M.R.S.A. § 275–N (1997 & Supp.1999).[7] At the February 25th hearing, the Commission stated that "in its decision making process [when it granted the licenses in December 1999, it] contemplated licensing facilities as commercial tracks or as other types of tracks."

[¶ 5] The Commission declined to reopen the race date hearing and allowed its determination that BHT was a commercial track to stand for the 1999 race year. The Commission also stated that Davric could raise the issue again at the 2000 hearing.[8] Davric then filed a complaint in the Superior Court, appealing the Commission's decision concerning the race dates and the designation of BHT as a commercial track and raising claims of unjust enrichment and conversion against BHT and Ival Cianchette, personally. The defendants filed a motion to dismiss Davric's complaint. The court granted that motion on the basis that Davric's appeal was untimely. After finding the appeal untimely, the court dismissed Davric's independent claims as barred by res judicata, the Commission's decision being final. This appeal followed.

## II. STANDARD OF REVIEW

[¶ 6] We ordinarily review a motion to dismiss by examining the complaint in a light most favorable to the plaintiff and accepting the material facts of the complaint as true. *See Brown v. Maine State Employees Association*, 690 A.2d 956, 958 (Me.1997). In the present case, however, we do not make any favorable inferences in favor of Davric because the motion to dismiss is based on the subject matter jurisdiction of the court. *See Hodgdon v. U.S.*, 919 F.Supp. 37, 38 (D.Me.1996) (stating that when a party challenges the jurisdiction of the court pursuant to Fed. R.Civ.P. 12(b)(1), the "court does not draw inferences favorable to the pleader, but should consider any material outside the pleadings submitted by the pleader and the movant").

## III. SUBJECT MATTER JURISDICTION

[¶ 7] Davric contends that the court had subject matter jurisdiction because the licensing and race date decision did not address BHT's status as a commercial

---

7. Section 275–N provides:

   The commission may not allow interstate simulcasting or license any off-track betting facility for any calendar year unless during the preceding calendar year there was at least 150 race dates on which live racing was actually conducted at the commercial tracks. Interstate simulcasting must always be allowed at any commercial track that conducted at least 136 race dates during the immediately preceding calendar year or at an existing commercial track as defined in section 275–A, subsection 1, paragraph B at which at least 35 race dates were conducted during the immediately preceding year. For the purposes of this section, any race date that the commission determines was canceled due to a natural or other disaster must be counted as a race date.

   8 M.R.S.A. § 275–N.

8. We note that the 2000 race date and licensing hearings have come and gone without Davric challenging BHT's status as a commercial track.

track. The Superior Court found that the Commission did determine BHT's status as a commercial track at the licensing and race date hearing in November. The court was correct in its conclusion.

## A. Commercial Track Determination

■■ [¶ 8] Davric asserts that the court erred because 8 M.R.S.A. § 271 does not require the Commission to determine whether the track is a commercial track pursuant to section 275–A before it issues a license. Section 271, however, does require the Commission to consider whether all the statutory requirements of the chapter are satisfied before it issues a license. *See* 8 M.R.S.A. § 271(1). Section 271(1) provides that the Commission may issue a license once "the commission is satisfied that all of this chapter . and rules prescribed by the commission have been substantially complied with during the past year and will be fully complied with during the coming year..." *See id.*

[¶ 9] Further, the record manifests that the Commission did analyze whether BHT was a commercial track pursuant to section 275–A. The Commission noted, at the February 25th hearing, that it considered what types of tracks it was licensing when it issued licenses and race dates. More importantly, when the Commission listed BHT as a commercial track on the race date list and simultaneously issued its license, the Commission explicitly expressed its judgment that BHT was a commercial track. Implicit in this statement is the Commission's conclusion that BHT substantially complied with all the require-

ments of Chapter 11, including meeting the definition of a commercial track pursuant to section 275–A(1). *See* 8 M.R.S.A. § 271(1); *Driscoll v. Gheewalla*, 441 A.2d 1023, 1029–30 (Me.1982) (upholding agency finding because record implicitly supported such a finding even though no express finding existed).

[¶ 10] Section 275–N further supports the conclusion that the Commission found BHT to be a commercial track. Section 275–N requires that the commercial tracks in the state hold a total of 150 live race dates in the preceding calendar year before the Commission may allow interstate simulcasting or off-track betting. *See* 8 M.R.S.A. § 275–N. The Commission issued Davric 138 live race dates and BHT 37 live race dates. Implicit in the Commission's allotment of less than 150 live race dates to Davric is the Commission's determination that BHT was a commercial track; otherwise, the simulcasting and off-track betting would not be allowed for the 2000 race year. *See id.; Driscoll*, 441 A.2d at 1029–30. Thus, the Commission made a final decision concerning BHT's status as a commercial track in its decision dated December 7, 1998.[9]

## B. Timeliness

■■ [¶ 11] The court determined that it did not have subject matter jurisdiction to review the Commission's determination that BHT was a commercial track because Davric's appeal was not made within thirty days of the Commission's decision as required by 5 M.R.S.A. § 11002(3) (1989).[10]

---

9. Davric also maintains that BHT's eligibility to receive distributions from the OTB and CMA funds, pursuant, respectively, to 8 M.R.S.A. §§ 295 and 287(2), cannot be determined at the race date hearing. This argument is wholly unsubstantiated. Section 295 merely requires distribution of the OTB account to "commercial race tracks ." *See* 8 M.R.S.A. § 295. Section 287(2) requires the Commission to distribute the CMA account to commercial meet licensees and section 275–A defines a commercial meet as a race at a commercial track. *See* 8 M.R.S.A. § 275–A. Thus, BHT's eligibility for these funds was contingent upon its status as a commercial

track—a determination that the Commission permissibly made at the race date hearing.

10. Section 11002 states in relevant part:

1. **Proceedings instituted.** Proceedings for judicial review of final agency action ... shall be instituted by filing a petition for review in the Superior Court ... :

\* \* \*

3. **Petition filed.** The petition for review shall be filed within 30 days after receipt of notice if taken by a party to the proceeding of which review is sought.

5 M.R.S.A. § 11002.

Statutory limitations on appeal periods are jurisdictional. *See Brown v. State*, 426 A.2d 880, 888 (Me.1981). The December 7th decision specifically notifies the parties that appeal to the Superior Court must be made within thirty days of the receipt of the decision. The Administrative Procedures Act requires the party appealing a final agency action to appeal within thirty days of notice. *See* 5 M.R.S.A. § 11002(3). Davric's Superior Court appeal was not filed until March 1, 1999—eighty-three days after the agency's final decision. Davric did not even raise the issue as to BHT's status before the Commission until January 25, 1999—forty-nine days after the decision was rendered.

[¶ 12] Davric argues that its appeal was timely because the agency's final decision was on January 25, 1999, the last date of the hearings, not on the date the decision was issued. This argument lacks merit because the Commission did not re-open the general hearing on January 25, 1999, but rather re-opened discrete portions of the hearing to address the requests for reconsideration that it received. BHT's status as a commercial track was not among the list of requests for reconsideration. Moreover, after the Commission received a request from Davric to review BHT's status as a commercial track on January 25, 1999, the Commission allowed Davric a hearing to assist the Commission in determining whether it was necessary to re-open the BHT issue. The Commission determined that its December 7th decision should stand because Davric did not seasonably raise the issue. The Superior Court correctly found that Davric's appeal was untimely.

[¶ 13] The other issues raised by Davric do not merit discussion.

The entry is:

Judgment affirmed.