STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-09-016

SCRIBNER'S MILL PRESERVATION, INC.
        Petitioner

v.

MAINE DEPARTMENT OF
ENVIRONMENTAL PROTECTION, ET AL.,
        Respondents

ORDER ON RESPONDENTS'
MOTION TO DISMISS

Petitioner Scribner's Mill Preservation, Inc. (hereinafter "Petitioner" or

"SMPI") filed an appeal from decisions by the Respondents, the Maine

Department of Environmental Protection (hereinafter "DEP") and the Maine

Board of Environmental Protection (hereinafter "BEP" or "the Board").[1] Before

the court is the Respondents' Motion to Dismiss SMPI's appeal for lack of

jurisdiction pursuant to Rule 12(b)(1).

## PROCEDURAL AND FACTUAL HISTORY

On November 15, 2002, SMPI filed an application with the DEP for a

Maine Waterway Development and Conservation Act (MWDCA) permit and

Water Quality Certificate. SMPI sought DEP approval to restore the currently

breached Scribner's Mill Dam on the Crooked River to operate a hydro-powered

sawmill. In response to agency and public comments on the initial application,

SMPI submitted a revised application for the project on August 27, 2007. The

---

[1] The Board of Environmental Protection is part of the Department of Environmental Protection, however the Board has decision-making authority independent of the Commissioner of the Department of Environmental Protection. The Board is charged by statute with providing "informed, independent and timely decisions on the interpretation, administration and enforcement of the laws relating to environmental protection and to provide credible, fair and responsible public participation in department decisions." 38 M.R.S. § 341-B. Among the Board's duties is the review of license and permit decisions made by the Department of Environmental Protection. 38 M.R.S. § 341-D(4).

DEP denied SMPI's application on December 31, 2008. On February 4, 2009, SMPI filed a timely appeal of the DEP's decision, and the matter was referred to the Maine Board of Environmental Protection. The Board affirmed the DEP's decision on April 16, 2009. SMPI received written notice of the Board's decision on April 23, 2009.

On May 19, 2009, SMPI filed a Request for Extension of Time, and also filed its Petition for Review to the Superior Court pursuant to Maine's Administrative Procedure Act (APA). 5 M.R.S. § 11001. Scott Hatch, a Trustee of SMPI, filed the appeal on behalf of the SMPI. SMPI requested an extension of the filing deadline upon filing its appeal, having believed that the 30–day response period began to run from the date of the Board's decision on April 16th, as opposed to the date of receipt of written notice. SMPI was mistaken about the filing deadline for its petition for review. The Board's files show that Petitioner received the Board's written decision on April 27, 2009, and that SMPI had until May 27th to file its appeal. On May 20th, the court accepted the Petition for filing.[2] On June 2nd, the Respondents filed a 12(b)(1) Motion to Dismiss SMPI's Rule 80C appeal. On June 18, 2009, Attorney Scott Anderson filed a Notice of Appearance on behalf of SMPI, and filed a brief in Opposition to Respondents' Motion to Dismiss on June 19th.

The Respondents do not challenge the timeliness of SMPI's May 19th Petition for Review, as by their own admission SMPI had until May 27th to file a proper appeal. It is also not in dispute that the June 19th filing by Attorney Scott

---

[2] In response to the Petitioner's ex parte Request for Extension of Time, filed on May 19, 2009, the court ordered "Petition to be accepted for filing." This order did not adjudicate the timeliness or sufficiency of the filing, but merely instructed the clerk to accept and file the Request for Extension.

Anderson on behalf of SMPI was filed beyond the statutory appeal deadline. Respondents' main argument in their 12(b)(1) Motion to Dismiss is that the petition is a nullity and must be dismissed because Petitioner did not file its appeal through an attorney licensed to practice in Maine, as required by 4 M.R.S. § 807 and § 811.[3] The question before the court is whether SMPI's May 19th petition for review should be dismissed because counsel did not represent SMPI when it was filed.

## DISCUSSION

The Respondents move to dismiss SMPI's appeal for lack of jurisdiction under M.R. Civ. P. 12(b)(1). The court "ordinarily review[s] a motion to dismiss by examining the complaint in the light most favorable to the plaintiff and accepting the material facts of the complaint as true." *Davric Maine Corp. v. Historic Track Inc.*, 2000 ME 102, ¶ 6, 751 A.2d 1024, 1028. However, in cases where the motion to dismiss challenges the subject matter jurisdiction of the court, the court does "not make any favorable inferences in favor of [the pleader]." *Id.*

Rule 80C(b) provides that the time within which review may be sought of final agency action is governed by 5 M.R.S. § 11002(3). M.R. Civ. P. 80C(b). Section 11002(3) of the Administrative Procedure Act provides: "[t]he petition for review shall be filed within 30 days after receipt of notice if taken by a party

---

[3] 4 M.R.S. § 807 states the prohibition against and the exceptions to the unauthorized practice of law. Section 807(1) provides: "No person may practice law or profess to practice law within the State or before its courts, or demand or receive any remuneration for those services rendered in this State, unless that person has been admitted to the bar of this State . . . ."

Section 811 of Title 4 defines "person" as "any individual, corporation, partnership, or association."

to the proceeding of which review is sought." 5 M.R.S. § 11002(3). The time limitations in the APA are jurisdictional, and the court has no authority to extend the statutory appeal period. *Brown v. Dep't of Manpower Affairs*, 426 A.2d 880, 887-888 (Me. 1981).

## I. Subject Matter Jurisdiction

The Respondents argue that SMPI's appeal should fail because it filed its appeal without representation of counsel. According to the Law Court, "a corporation may appear in court only through a licensed attorney." *Land Management, Inc. v. Dept. of Environmental Protection*, 368 A.2d 602, 603 (Me. 1977) (citing 4 M.R.S. §§ 807, 811). The Court in *Land Management* affirmed the lower court's holding that the complaint "was a nullity and was properly dismissed" because the plaintiff corporation was not represented by a licensed attorney. *Id* at 604. *See also Spickler v. York*, 566 A.2d 1385, 1390 (Me. 1989) (holding that "it is only proper to bring a suit for a corporation through a licensed attorney").

In the case at hand, SMPI is a non-profit corporation registered with the State of Maine. SMPI brought its appeal through Scott Hatch. Hatch is a trustee of SMPI and is not licensed to practice law.

SMPI contends that their petition should be accepted because SMPI complied with M.R. Civ. P. 5(f)[4] and complied with the APA[5] when the May 19th

---

[4] M.R. Civ. P. 5(f) states: "Filings that are received but which are not signed, or are not accompanied by a legally required element, including but not limited to, a filing fee, appeal fee, registry recording fee and envelope or summary sheet, or, if filed by an attorney, do not have the attorney's Maine Bar Registration Number, shall be returned by the clerk as incomplete."

[5] Section 11001(2) states: "Any person aggrieved by the failure or refusal of an agency to act shall be entitled to judicial review thereof in the Superior Court."

Section 11002 provides the minimum contents of a petition: "The petition for review shall specify the persons seeking review, the manner in which they are aggrieved

petition was filed. Notwithstanding SMPI's absence of counsel, a complete petition was filed and accepted by the court. As a result, SMPI contends that Respondents' Motion to Dismiss should be denied.

Relying on *Persson v. Department of Human Services*, SMPI argues that the court clerk should have notified SMPI that its filing was incomplete due to the absence of legal counsel. 2001 ME 124, ¶¶ 12-14, 775 A.2d 363, 366. The petitioner in *Persson* was incarcerated in Wisconsin, he was representing himself, and was appealing from a child support decision by the Department of Human Services. *Id.* at ¶ 1. 775 A.2d at 364. The Superior Court dismissed Persson's petition for review on the ground that Persson's petition was untimely and incomplete. *Id.* at ¶ 6-7, 775 A.2d at 364-65. However, the Law Court reinstated Persson's petition holding that by not returning the petitioner's incomplete filing, the court clerk failed to comply with M.R. Civ. P. 5(f)'s requirement that "incomplete filings shall be returned by the clerk." *Persson*, 2001 ME 124, ¶ 14, 775 A.2d at 366. Although *Persson* is not completely analogous to the situation in this case, it is similar in that the court, in each case, contributed to the confusion leading to the violation.

Here, the court itself sowed the seeds of confusion when it ordered SMPI's "Petition to be Accepted for filing" on May 20, 2009. *See supra* n. 2. When the court clerk presented SMPI's May 19th filing to the court, the issue presented was the timeliness of filing. Had the court recognized that Scott Hatch was not an attorney, the filing would have been rejected which would have provided SMPI

---

and the final agency action or agency inaction which they wish reviewed. It shall also contain a concise statement as to the nature of the action or inaction to be reviewed, the grounds upon which relief is sought and a demand for relief, which may be in the alternative."

with an opportunity to obtain legal representation. *See e.g., Kawka v. Coyne*, 2000 Me. Super. LEXIS 107, * 1. At the time the court made that order, SMPI still had seven days to obtain representation. Because the court accepted the May 19th filing, SMPI was never put on notice of the need for legal counsel.

The Respondents' reliance on *Land Management* can be distinguished in this case. The plaintiff's claim in *Land Management* was dismissed by the Superior Court without prejudice.[6] *Land Management Inc. v. Dept. of Environmental Protection*, No. CV-76-183 (May 19, 1976) (order dismissing action). In other words, the plaintiff in *Land Management* would have had the opportunity to obtain counsel and refile his claim. Here, dismissing the action would put an end to SMPI's appeal because the statutory appeal period has run. Such a result would be unjust given the circumstances.

## DECISION

Therefore, the entry is:

Respondents' Motion to Dismiss is DENIED

Dated at Portland, Maine this _____ day of _____, 2009.

_____
Robert E. Crowley
Justice, Superior Court

---

[6] "Unless otherwise specified in the order, a dismissal under [Rule 41] is without prejudice." M.R. Civ. P. 41(a)(2).

Date Filed __05-19-09__      __CUMBERLAND__      Docket No. __AP-09-16__

County

Action __80C__ Appeal

SCRIBNER'S MILL PRESERVATION
C/O SCOTT D. HATCH
232 SCRIBNER MILL RD.
HARRISON, ME 04040

MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION
MAINE BOARD OF ENVIRONMENTAL PROTECTION

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| PRO-SE<br>SCOTT D. ANDERSON ESQ<br>VERRILL & DANA<br>PO BOX 586<br>PORTLAND ME 04112-0586 | JANET MCLINTOCK AAG<br>DEPARTMENT OF THE ATTORNEY GENERAL<br>6 STATE HOUSE STATION<br>AUGUSTA ME 04330 |

Date of

STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. AP-09-016,
                                          REC    -CUM- 3/5 -

SCRIBNER'S MILL PRESERVATION, INC.
      Petitioner
                                        ORDER ON PETITIONER'S
v.                                      80C APPEAL

MAINE DEPARTMENT OF
ENVIRONMENTAL PROTECTION, ET AL.,
      Respondents

## BEFORE THE COURT

Pursuant to Rule 80C of the Maine Rules of Civil Procedure, Petitioner

Scribner's Mill Preservation, Inc. (SMPI) appeals the Maine Board of

Environmental Protection's (the "Board" or "BEP") April 16, 2009 decision,

denying SMPI's application to construct and operate a hydro-mechanical dam on

the Crooked River for the Scribner's Mill Project. The BEP denied SMPI a Maine

Waterway Development and Conservation Act ("MWDCA") permit pursuant to

38 M.R.S. § 636, and a water quality certification pursuant to Section 401 of the

Clean Water Act ("CWA"), 33 U.S.C. § 1341 and 38 M.R.S. § 464. The court

accepted an *Amicus Curiae* Brief in support of the Respondent on February 11,

2010.[1]

## BACKGROUND AND PROCEDURAL HISTORY

### I.  The Scribner's Mill Project

---

[1] The *Amicus Curiae* Brief was filed on behalf of the following interested parties:
Natural Resources Council of Maine, Maine Rivers, Sebago Lake Anglers Association,
Friends of the Presumpscot, Lakes Environmental Association, Maine Congress of Lakes
Associations, Maine Council of Trout Unlimited, Western Foothills Land Trust, Donald
Gossett Jr., Greg Murrer, and Jonathan Peterson.

1

Through the Scribner's Mill Project, SMPI aims to restore and operate a water-powered sawmill using original 19th century equipment as part of an education center and museum. Under its current plan, SMPI's project requires constructing and operating the Scribner's Mill Dam on the Crooked River in the Towns of Harrison and Otisfield. The dam is located about 21 miles upstream from Sebago Lake. The Scribner's Mill originally operated from 1851 to 1962, and was used to cut timber and lumber, and to manufacture other wood products such as shingles, barrels, and wooden handles. A dam existed at Scribner's Mill until 1972, when it was breached to improve passage for landlocked salmon.[2] If SMPI's project were completed, Scribner's Mill would operate as one of the last remaining historic sawmills in the United States.

## II. Procedural History

On November 15, 2002, SMPI submitted its initial application for a MWDCA permit and a Water Quality Certification. In accordance with the established procedure for review of hydropower projects pursuant to 38 M.R.S. § 634(3), the Department of Environmental Protection circulated SMPI's application to State agencies and interested non-governmental organizations, including the Department of Inland Fisheries and Wildlife ("IF&W"). In response to agency and public comments on the initial application, SMPI submitted a revised application for the project on August 27, 2007. The Commissioner treated this application as a replacement for the initial application. As revised, the application called for:

---

[2] These background facts are from the findings of the Commissioner of the Department of Environmental Protection's December 31, 2008 Department Order.

[T]he reconstruction of the breached Scribner's Mill Dam with an integrated rock ramp fishway, completion of the on-going reconstruction of the historic mill building, and the construction, installation and operation of water intake structures, penstocks and water wheels to power the sawmill equipment. The reconstructed dam would create an impoundment with a surface area of 10.8 acres at a [sic] full pond elevation . . . . The impoundment would extend upstream about 1.1 miles.[3] The affected area of the Crooked River is classified as Class A.[4]

SMPI also further revised the project by reducing the slope of the proposed fishway to a 2.6% slope, compared to a 5% slope included in the original proposal. On October 24, 2008, the Commissioner issued a draft order denying SMPI's application. The Commissioner received comments on the draft order from SMPI, the IF&W, and the Natural Resources Council of Maine. The

---

[3] In their Reply Brief, Petitioners allege that the BEP relied on misleading information from the IF&W to describe the impact of the proposed dam. SMPI Reply Brief, pp. 6-7. The BEP's reference to 10.8 acres and the distance upstream that would be affected by the impoundment appear to be misstated. According to the report prepared by SMPI's consultant, 1.1 miles upstream is the theoretical upper limit of the area affected by the impoundment and water elevation will only increase by approximately three inches. R. Tab 314, p. 238k.k., Woodlot Report. Additionally, the wetted surface area of the area upstream from Scribner's Mill is currently 8.9 acres during normal flow conditions, and with the dam the wetted area will increase by 1.9 acres to a total of 10.8 acres. *Id.* However, this misstated information was only in the BEP's description of the project under "Procedural History," and neither of these figures appears to have directly factored into the BEP's consideration of the permitting criteria pursuant to 38 M.R.S. § 636.

[4] As pointed out by the *amicus* parties, a recent amendment to Maine's water quality laws establishes "the Crooked River and its tributaries, except as otherwise provided, excluding existing impoundments" as a Class AA waterway. 38 M.R.S. § 467(9)(B)(2) (2009). Prior to this amendment, and the standard in effect when SMPI filed its application, the entirety of the Crooked River and its tributaries were classified as Class AA, with the exception of existing impoundments on the river and the area of the river previously impounded at Scribner's Mill, which were classified as Class A. 38 M.R.S. § 467(9)(B)(2) (2008). Class AA waters are the highest water quality classification, which is "applied to waters which are outstanding natural resources and which should be preserved because of their ecological, social, scenic or recreational purposes." 38 M.R.S. § 465(1). Class AA waters must be free-flowing and natural. *Id.*

Commissioner issued its final order on December 31, 2008, denying SMPI's application. SMPI filed a timely appeal to the BEP on February 4, 2009.[5]

On April 16, 2009, the BEP issued its decision, which incorporated and upheld the Commissioner's decision. Specifically, the BEP found that SMPI has not met its burden of affirmatively demonstrating[6] that its proposed project meets the public benefit, environmental mitigation, environmental and energy considerations, and water quality criteria necessary for approval under the Maine Waterway Development and Conservation Act, 38 M.R.S. §§ 636 (3), (6), (7), and (8). The failure to meet the applicable water quality standards led to the denial of a water quality certification under Section 401 of the Clean Water Act. 33. U.S.C. § 1341.

## III. The Legal Framework

### a. The Maine Waterways Development and Conservation Act

The Maine Waterways Development and Conservation Act was passed to create a single application and permitting process for hydropower development.

---

[5] The Department of Environmental Protection consists of the Commissioner and the BEP. 38 M.R.S. § 341-A(2). The Commissioner makes most licensing decisions, which may be appealed to the BEP for review. 38 M.R.S. §§ 341-A(4) and 341-B. An aggrieved party has 30 days after receipt of notice of final agency action to file a petition for judicial review. 38 M.R.S. § 346(1), 5 M.R.S. § 11002. For this reason, SMPI's appeal is only from the BEP's April 16, 2009 decision.

[6] The DEP's *Rules Concerning the Processing of Applications and Other Administrative Matters*, 06-096 CMR 2 § 11(F), provide guidance on an applicant's burden of proof. Under the rules, "[a]n applicant for a license has the burden or proof to affirmatively demonstrate to the Department that each of the licensing criteria in statute or rule has been met. . . . For those matters relating to a licensing criteria [sic] that are disputed by evidence the Department determines is credible, the applicant has the burden of proving by a preponderance of the evidence that the licensing criteria are satisfied."

38 M.R.S. § 632(2).[7] The policy and purpose of the MWDCA states: "[I]t is the policy of the State to support and encourage the development of hydropower projects by simplifying and clarifying requirements for permits, while assuring reasonable protection of natural resources and the public interest in the use of waters of the State." *Id.* The MWDCA requires any person initiating construction or reconstruction of a hydropower project to secure a permit from the Department of Environmental Protection. 38 M.R.S. § 633. In order for a permit to be approved, the MWDCA requires the applicant to demonstrate, and the DEP to approve, that the proposed hydro project meets eight criteria. 38 M.R.S. § 636, *Save Our Sebasticook, Inc. v. Bd. of Envtl. Prot.*, 2007 ME 102, ¶ 14, 928 A.2d 736, 740. In reviewing SMPI's permit the BEP found that SMPI's project did not meet four of the eight criteria. The four criteria under Title 38, Section 636 the BEP determined SMPI did not meet are as follows:

3. **Public Benefits.** The project will result in significant economic benefits to the public, including, but not limited to, creation of employment opportunities for workers of the State.

6. **Environmental mitigation.** The applicant has made reasonable provisions to realize the environmental benefits of the project, if any, and to mitigate its adverse environmental impacts.

7. **Environmental and energy considerations.** The advantages of the project are greater than the direct and cumulative adverse impacts over the life of the project based upon the following considerations:
   A. Whether the project will result in significant benefit or harm to soil stability, coastal and inland wetlands or the natural environment of any surface waters and their shorelands;
   B. Whether the project will result in significant benefit or harm to fish and wildlife resources. In making its determination, the department shall consider other existing uses of the watershed and fisheries management plans adopted by the Department of Inland Fisheries and Wildlife, the Department of Marine Resources and the Atlantic Salmon Commission;

---

[7] Under the statute, "hydropower" includes both electrical and mechanical power. 38 M.R.S. § 632(4).

5

C. Whether the project will result in significant benefits or harm to historic and archeological resources;

D. Whether the project will result in significant benefit or harm to the public rights of access to and use of the surface waters of the State for navigation, fishing, fowling, recreation and other lawful public uses;

E. Whether the project will result in significant flood control benefits or flood hazards; and

F. Whether the project will result in significant hydroelectric energy benefits, including the increase in generating capacity and annual energy output resulting from the project, and the amount of nonrenewable fuels it would replace.

The department shall make a written finding of fact with respect to the nature and magnitude of the impact of the project on each of the considerations under this subsection . . . .

8. **Water Quality.** There is reasonable assurance that the project will not violate applicable state water quality standards, including the provisions of section 464, subsection 4, paragraph F, as required for water quality certification under the United States Water Pollution Control Act, Section 401. This finding is required for both the proposed impoundment and any affected classified water bodies downstream of the proposed impoundment.

*See* 38 M.R.S. § 636.

The Department of Environmental Protection further defined the requirements of 38 M.R.S. § 636 by administrative rule. Me. Dep't of Envtl. Prot., *Administrative Rules for Hydropower Projects*, 06-096 CMR 450.[8] To meet the "public benefit" criterion under 38 M.R.S. § 636(3), the rules require the applicant to show that the economic benefits "claimed from the proposed project are real, in that these benefits would not result but for the project. . . . [and] the applicant must demonstrate that the project's economic benefits are greater than it's [sic] economic costs, and that the resulting net benefit is significant." 06-096 CMR 450 § 5(A)(3). The rules acknowledge that the terms "benefit" and "significant" inherently require comparisons between alternative conditions. *Id.*

---

[8] *Available at the following website address:*
http://www.maine.gov/sos/cec/rules/06/chaps06.htm

6

Under 38 M.R.S. § 636(6), the criterion for "environmental mitigation," the rules define "mitigation" as "any action taken or not taken to avoid, minimize, rectify, reduce, eliminate, or compensate for actual or potential adverse environmental impacts." 06-009 CMR 450 § 3(H). The reasonableness of an applicant's provisions to mitigate adverse environmental impacts depends on the significance of the resources affected. 06-096 CMR 450 § 5(A)(6). Additionally, under the criterion "environmental and energy considerations," 38 M.R.S. § 636(7), the rules provide the criterion will be met when the balance of the project's advantages are greater than the project's adverse impacts based on the specified environmental and energy considerations enumerated under Section 636(7)(A)–(F). 06-096 CMR 450 § 5(A)(7).

### b. The Clean Water Act

SMPI's proposed project is subject to the requirements of the Federal Clean Water Act because it qualifies as an "activity . . . which may result in [a] discharge into the navigable waters [of the United States]." 33 U.S.C. § 1341(a)(1). Under Section 401 of the CWA, an applicant for a federal license or permit to conduct an activity that may result in a discharge must comply with state water quality standards. *Id.* This requirement is reiterated in the MWDCA under Section 636(8), which requires reasonable assurance that the project will not violate applicable state water quality standards. 38 M.R.S. § 636(8).

The State of Maine classifies water quality standards based on (1) designated uses and related characteristics of those uses, (2) water quality criteria necessary to protect those uses, and (3) a water quality antidegradation policy. 38 M.R.S. § 464(1). Class A waters are the second highest water quality classification. 38 M.R.S. § 465(2). Class A waters must be characterized as

7

natural, and certain designated uses that disrupt the flow are permitted. 38 M.R.S. § 465(2)(A). The designated uses for Class A waters include recreation, habitat for fish and other aquatic life (which must be characterized as natural), fishing, navigation, and certain hydroelectric power generation. *Id*. The water quality criteria for Class A waters require that the dissolved oxygen content be not less than 7 parts per million or 75% saturation, whichever is higher; and the aquatic life and bacteria content of Class A water shall be as naturally occurs. 38 M.R.S. § 465(2)(B). The antidegradation policy provides that "[e]xisting in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected," and that "[e]xisting in-stream water uses are those which have actually occurred on or after November 28, 1975, in or on a water body whether or not the uses are included in the standard for classification of the particular water body." 38 M.R.S. § 464(4)(F).

## IV.  SMPI's Grounds for Appeal

On appeal, SMPI argues that the BEP's permit denial is inconsistent with the MWDCA and constitutes legal error. SMPI argues that: (1) because the BEP concluded that several alternatives to the proposed dam were available, the BEP incorrectly applied an "alternatives" test to the MWDCA, and did not properly balance the statutory criteria of the MWDCA; (2) the BEP improperly relied on a factually incorrect, results driven report by the IF&W, and that the BEP unlawfully delegated its decision-making authority to the IF&W; and (3) the BEP failed to recognize that the Legislature has pre-determined that fish passage facilities are sufficient mitigation for any adverse impacts a project will have on upstream and downstream fish migration.

## DISCUSSION

8

## I. Standard of Review

When the Superior Court acts in an appellate capacity to review a decision of an administrative agency, the court reviews the agency's decision directly for an abuse of discretion, error of law, or findings not supported by the evidence. *Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 12, 977 A.2d 400, 407. In evaluating an 80C Appeal, it is not for the court to determine whether it would have reached the same result as the agency, but to decide whether the record contains competent and substantial evidence in support of the decision reached. *CWCO, Inc. v. Superintendent of Insurance*, 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261. "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Id.* The party seeking review of final agency action has the burden of proof. *Greely v. Comm'r, Dep't of Human Servs.*, 2000 ME 56, ¶ 9, 748 A.2d 472, 474. In order to meet this burden, a petitioner must demonstrate that the record compels a contrary conclusion. *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566, 569. "Inconsistent evidence will not render an agency decision unsupported." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555.

## II. Alternatives Analysis

SMPI contends that the MWDCA is unlike other statutes within the DEP's jurisdiction, such as the Natural Resources Protection Act, 38 M.R.S. § 481, because the MWDCA specifically promotes the creation of hydropower projects, and because the MWDCA does not require an "alternatives analysis," i.e., a showing by the applicant that no less environmentally damaging alternative to

9

the proposed project is possible.[9] SMPI contends that the MWDCA does not contain an alternatives analysis and that the BEP committed legal error when it applied the alternatives analysis to the "environmental mitigation" and "public benefits" criteria under 38 M.R.S. § 636. SMPI argues that instead of an alternatives analysis, the MWDCA requires a balancing of factors for the "public benefits" and "environmental mitigation" criteria.

Contrary to SMPI's assertions, the BEP did not commit legal error by applying an alternatives analysis to its evaluation of SMPI's proposed project. With respect to the environmental mitigation criterion, the BEP found:

> [T]hat appellant has not presented any persuasive evidence that reasonable provisions have been made to realize the environmental benefits, if any, and to mitigate the adverse environmental impacts of the proposed project. The evidence in the record supports the findings that there are several *feasible alternatives* that would allow operation of some or all of the sawmill machinery, thus avoiding the adverse environmental impacts associated with the reconstruction of the dam.[10]

April 16, 2009 Order, p. 8 (emphasis added) ("BEP Order"). Under the environmental mitigation criterion, an alternatives analysis is implied. The term "mitigation" is defined as "any action taken or not taken to avoid, minimize, rectify, reduce, eliminate, or compensate for actual or potential adverse environmental impacts." 06-096 CMR 450 § 3(H). Mitigation actions include:

---

[9] *See, e.g.*, 09-096 CMR 310 § 9(A), which provides an alternatives analysis for applicants proposing regulated activities in, on, over, or adjacent to a wetland or water body.

[10] The three feasible alternatives based on SMPI's alternatives analysis mentioned in the BEP's findings are: "installing a gate in the breached section of the dam that could be opened to allow fish passage/ spawning activity and closed to allow mill operation; using various forms of auxiliary power to operate the mill; and using pumps to fill a headbox with river water that would then power the mill in the absence of a reconstructed dam." BEP Order, p. 8.

"[a]voiding an impact altogether by not taking a certain action or parts of an action," and "[m]inimizing an impact by limiting the magnitude or duration of an activity or by controlling the timing of an activity." *Id.* As the BEP argues, under this definition of mitigation, alternative may be considered to avoid potentially adverse environmental impacts.

SMPI argues that BEP's findings of feasible alternatives for the environmental mitigation criterion led the BEP to also find that SMPI did not meet the public benefit criterion. With respect to the economic benefits under the public benefit criterion, the BEP found that "[t]he evidence in the record supports the findings that there are several feasible alternative that would allow operation of some or all of the sawmill machinery, and this diminishes the economic benefits that can be claimed for the project." BEP Order, p. 10. An alternatives analysis may also be used to evaluate the potential public benefits of a proposed project. The *Administrative Regulations for Hydropower Projects* provides the following explanation of "benefit" as it is used in 38 M.R.S. § 636(3):

> "Benefit" is a term which requires a comparison between at least two conditions. . . . [I]n order to accurately evaluate the existence and extent of the economic benefits that may result from a proposed hydropower project, it is necessary to compare two alternative futures: the economic conditions likely to exist if the project is built versus those likely to exist without the project.

06-096 CMR 450 § 5(A)(3). The regulation clearly contemplates consideration of the economic outcome with the proposed project as opposed to without the proposed project. In considering the value of the of the project if built, compared to the economic outcome without the project, it is reasonable for the BEP to consider how feasible alternatives to the proposed project may diminish the overall economic benefit of completing the project. Therefore, the BEP's

11

interpretation of the MWDCA to employ an alternatives analysis is not an error of law. *See Save Our Sebasticook*, at ¶ 13, 928 A.2d at 740 (stating that an "administrative agency's interpretation of a statute administered by it, while not conclusive or binding on this [C]ourt, will be given great deference and should be upheld unless the statute plainly compels a contrary result.").

## III. Balancing the Statutory Criteria

SMPI claims that the MWDCA mandates a balancing test, and claims that the BEP did not give appropriate weight to the economic and social benefits of SMPI's project. SMPI claims that the BEP failed to give appropriate weight to employment opportunities, increases in the purchasing power of Maine citizens, and the benefits of energy security, and claims that the BEP instead focused on falsely inflated values assigned to fisheries. SMPI claims that the total value of the project is $409,191 per year, compared to an estimated loss of fish habitat worth only $15,325 annually. R. Tab 314, pp. 219-227; SMPI Brief, p. 21.

The DEP's *Administrative Regulations for Hydropower Projects* provides further guidance in terms of the types of economic costs and benefits the BEP should consider when evaluating the "Public Benefit" criterion.

> [E]conomic benefits *may* include, *but are not limited to*, increases in the income or purchasing power of Maine citizens, energy security from reducing dependence upon fossil fuels, and creation of employment opportunities for workers of the State. . . . [E]conomic costs *may* include, *but are not limited to*, decreases in the income or purchasing power of Maine citizens, the value of other hydroelectric generating opportunities diminished or eliminated by a project, and the elimination of employment opportunities for workers of the State.

06-096 CMR 450 § 5(A)(3) (emphasis added). The BEP accepted the Commissioner's December 31, 2008 findings that SMPI's proposed project would result in economic benefits to the public in the form of employment in the

12

production and transportation of specialty wood products, no-cost educational opportunities, and as an enhanced tourist attraction. The BEP also found that the economic benefits that can be claimed for the projects are much less than asserted by SMPI because (1) some of the claimed benefits already exist without constructing the dam, and (2) some of the claimed benefits for the project can be achieved by alternatives to the construction of the dam, further diminishing the value of the proposed project. The BEP also agreed with the Commissioner and found that the proposed project would result in economic costs to the public due to adverse impacts on an economically significant Crooked River/ Sebago Lake landlocked salmon fishery because the project will reduce upstream passage, spawning and nursery habitat, and will reduce recreational fishing for landlocked salmon. The BEP's findings are supported by substantial evidence, and SMPI has not met its burden in demonstrating by a preponderance of the evidence that the construction of the dam will result in a significant economic benefit.

SMPI also contends that the BEP did not properly balance the environmental and energy considerations required by 38 M.R.S. § 636(7). Specifically, SMPI contends that the BEP violated the MWDCA by undervaluing hydro-mechanical projects. This argument is unsupported because SMPI's main support for this claim is from a September 19, 1985 memo to the Commissioner of the Department of Conservation – which was written nearly 25 years prior to the BEP's decision. SMPI Brief, p. 23, citing R. Tab. 5, p. 2. Additionally, SMPI claims the BEP violated the MWDCA by failing to give sufficient weight to the benefits of historical preservation.

As stated above, the BEP is required to balance advantages of a proposed project against its direct and cumulative adverse impacts over life of the project based on the enumerated considerations of Section 636(7). In weighing the considerations, the BEP concluded that the existing landlocked salmon fishery is too important a resource to put at risk of diminishment for the sole benefit of the restoration of a historic water powered sawmill. The BEP found that reconstruction of the breached dam would substantially alter 2,000 square feet of the landlocked salmon spawning habitat and would alter 1.4 acres of nursery habitat. Additionally, the BEP found that the proposed rock ramp fishway would reduce upstream passage for adult landlocked salmon from 100% to 99.5% and for juvenile landlocked salmon from 45% to 28.2% at river flows between 25 cubic feet per second (cfs) and 650 cfs, when compared to existing conditions. The BEP's findings with respect to environmental and energy considerations are supported by substantial evidence.

## IV. The IF&W's Report

SMPI argues that the BEP's reliance on the IF&W's report constituted an impermissible delegation of the BEP's decision-making authority, and claims that IF&W's report was biased against the construction of a dam. The BEP acknowledges that well before any decisions were issued, the DEP had to correct the IF&W's consulting biologist Francis Brautigam as to the IF&W's limited advisory role, and noted in that letter that many of Brautigam's recommendations appeared to go beyond the IF&W's limited role of evaluating the impacts on fisheries. R. Tab 314, p. 261; Letter from Dana Paul Murch, Dams and Hydropower Supervisor, Dep't of Envtl. Prot., to Francis Brautigam, Regional Fisheries Biologist, Maine IF&W (March 24, 2008). Brautigam's overly

14

critical analysis was noted in the BEP's Order. BEP Order, p. 7. Based on these efforts, the DEP and the BEP ensured that the IF&W report was not taken into consideration beyond its limited advisory role pursuant to 38 M.R.S. § 634(3) and § 636(7)(B). SMPI has failed to offer any evidence showing that the DEP or BEP improperly delegated decision-making authority to the IF&W or improperly relied on findings in the IF&W's report. As a result, SMPI's claim that the BEP's use of the IF&W report constituted legal error fails.

### a. Water Quality

SMPI alleges that the BEP's reliance on the IF&W's comments led to the BEP's finding that the proposed project did not meet the water quality standards under 38 M.R.S. § 636(8) and Section 401 of the Clean Water Act. 33 U.S.C. § 1341. SMPI claims that this is evidenced by the DEP's change in position from believing the project would meet water quality standards, to stating in the DEP Order without explanation that the project would not meet water quality standards. *See* SMPI Brief, p. 15 n. 3. In support of its assertion, SMPI references a form dated May 27, 2003, which contains the comments of two members of the DEP's Biological Monitoring Program within the Division of Environmental Assessment. R. Tab 61, p. 13.

As the BEP points out, SMPI has taken the comments on this form out of context. According to the BEP, the Biological Monitoring Program assesses the health of rivers, streams, and wetlands by using water sample results to determine attainment of water quality standards associated with Class AA, A, B, and C water bodies. BEP Brief, p. 23. The BEP states the comments from the Biological Monitoring Program are limited to whether or not SMPI's proposed project will meet the water quality criteria for Class A water bodies. The

15

Commissioner of the DEP accepted, and the BEP adopted, the Biological Monitoring Programs finding that with the proposed project in place, the water would contain sufficient dissolved oxygen to meet the Class A water quality standards.

However, the BEP found that the proposed project would not meet the State's antidegradation policy and did not meet the water quality criteria because with the project in place the river would not remain suitable for the designated uses of "habitat for fish" and "recreation". R. Tab 1, pp. 12-13. SMPI has failed to show that the BEP unreasonably relied on the IF&W's report with respect to the water quality criteria. The BEP's decision should be upheld because it is supported by substantial evidence, and because SMPI has failed to show an abuse of discretion or error of law.

## V. Are Fish Passage Facilities Always Sufficient Mitigation?

SMPI argues on page eleven of its brief that by passing the MWDCA the legislature recognized that dam projects involve adverse impacts and that some amount of adverse impact is permissible and acceptable. SMPI bases this conclusion on 38 M.R.S. § 635(1)(A)-(C), which lists permissible approval terms and conditions. According to Section 635(1)(C), the "terms and conditions *may* include, *but are not limited to:* . . . Provisions for the construction and maintenance of fish passage facilities." 38 M.R.S. § 635(1)(C) (emphasis added). The fact that the legislature allows the DEP to condition the approval of a project on the construction and maintenance of a fish passage facility does not mean that a fish passage facility will always be sufficient mitigation for any adverse impacts on fish migration that may result from the construction of a dam.

16

# DECISION

Therefore, the entry is:

    Scribner's Mill Preservation, Inc.'s 80C Appeal is DENIED.

Dated at Portland, Maine this ___18th___ day of ___March___, 2010.

_____
Robert E. Crowley
Justice, Superior Court

Date Filed  05-19-09          CUMBERLAND          Docket No.  AP-09-16
                               County

Action  80C Appeal


SCRIBNER'S MILL PRESERVATION          MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION
C/O SCOTT D. HATCH                    MAINE BOARD OF ENVIRONMENTAL PROTECTION
232 SCRIBNER MILL RD.
HARRISON, ME 04040                              vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| PRO-SE<br>SCOTT D. ANDERSON ESQ<br>VERRILL & DANA<br>PO BOX 586<br>PORTLAND ME 04112-0586 | JANET MCLINTOCK AAG   (MAINE DEP)<br>DEPARTMENT OF THE ATTORNEY GENERAL<br>6 STATE HOUSE STATION<br>AUGUSTA ME 04330<br>DAVID SWETNAM-BURLAND, ESQ.<br>STACY STITHAM, ESQ. (NATURAL RESOURCES –<br>PO BOX 3070          NOT A DIRECT PARTY)<br>LEWISTON ME 04243-3070 |

| Date of Entry | |
|---|---|
| 2009 | |