### Claire GULICK et al.[1]

### v.

### BOARD OF ENVIRONMENTAL PROTECTION.

Supreme Judicial Court of Maine.

Argued Nov. 5, 1982.

Decided Dec. 3, 1982.

---

1. The parties plaintiff in the Superior Court included the "Committee to Save Baxter Boule-

vard," an unincorporated association. We have removed the committee's name from the lead position in the caption of this case because, absent specific statutory authorization, an unincorporated association has no capacity to sue or be sued in its own name. *See* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 4.4, at 67 (2d ed. 1970). It is true that the issue of capacity was not addressed by the parties in this case prior to oral argument before the Law Court and that the defense of lack of capacity is waived unless raised in the pleadings, *see*

M.R.Civ.P. 9(a); *Royal Coachmen Color Guard v. Marine Trading & Transp. Inc.,* 398 A.2d 382, 384 n. 3 (Me.1979). Nonetheless, it appears to us inappropriate to allow a reported case to bear the name of a "committee" that lacks the capacity to be a party to a lawsuit where, as here, there exists at least one other party plaintiff, Claire Gulick, the owner of property near the proposed development, who clearly has capacity, as well as standing, to bring suit in this case.

Murray, Plumb & Murray, E. Stephen Murray (orally), Ellyn C. Ballou, Portland, for plaintiff.

Kay R.H. Evans (orally), Asst. Atty. Gen., for Board of Environmental Protection.

Drummond, Woodsum, Plimpton & MacMahon, P.A., John A. Graustein (orally), Ronald N. Ward, Portland, for Hannaford Bros. Co.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

McKUSICK, Chief Justice.

On a petition for review of agency action brought by Gulick and others, the Superior Court (Cumberland County) affirmed orders of the Board of Environmental Protection ("the Board") that approved the application of Hannaford Bros. Co. ("Hannaford") to construct a shopping center in the Back Cove area of the city of Portland. On appeal, plaintiffs contend, as they did in the Superior Court, that the Board's decision was not supported by substantial evidence on the whole record. A

careful review of the administrative record in this case has convinced us that the Board's action was in fact justified by the evidence before it, and we affirm the judgment of the Superior Court.

Under the terms of the Site Location of Development Law, 38 M.R.S.A. §§ 481–490 (1978 & Supp.1982–83), the Board of Environmental Protection may not approve a development proposal unless it finds, among other things, that "the developer has made adequate provision for traffic movement of all types out of or into the development area." 38 M.R.S.A. § 484(2). This appeal focuses solely upon the adequacy of Hannaford's traffic plans.

### I. *Procedural History*

On April 2, 1981, Hannaford applied to the Board for approval of a shopping center proposed to be built on land bordered by Forest Avenue to the west, Baxter Boulevard to the north, Preble Street Extension to the east, and route I–295 to the south. After receiving documentary evidence in the form of maps, plans, and traffic studies, and after holding a public hearing for the receipt of oral testimony on June 12, 1981, the Board issued a written order on October 28, 1981, approving Hannaford's application. The order contained a finding, pursuant to section 484(2), that the applicant had "made adequate provision for traffic movement of all types out of or into the development area." In support of that finding, the Board made the following underlying or subordinate findings of fact:

    3. The three access points to the proposed center are from Preble Street Extension, Baxter Boulevard and Forest Avenue. The Forest Avenue access is right turn in and right turn out only. The Preble Street Extension access is both left and right turn in and out. The Baxter Boulevard access is both left and right turn in and out with trucks prohibited.

      . . . .

Sight distances at the access points are: Preble Street to the north 720 plus feet; Preble Street to the south 720 plus feet; Baxter Boulevard to the northeast 420 plus feet; Baxter Boulevard to the southwest 420 plus feet; Forest Avenue to the south 620 plus feet.[2]

The Board's approval was explicitly conditioned upon "sight distances as noted in Finding # 3 [being] maintained at all access points."

On December 14, 1981, Gulick and others filed a petition for administrative reconsideration pursuant to 38 M.R.S.A. § 344(5). The petitioners objected to the Board's traffic findings and requested the Board either to reverse its October 28 approval of the project or to "reopen" the matter and require Hannaford to fund an independent traffic study by an outside consultant. Attached to the petition for reconsideration as an exhibit was a nine-page letter from William M. Altenburg, Jr., a registered landscape architect. That Altenburg letter, which was based on a review of the plans and testimony submitted to the Board before and at its June 12 hearing, concluded, among other things, that the actual sight distances at the center's planned entrance/exits were substantially shorter than the Board had found them to be, and that those actual sight distances were unsafe.

In response to the petition for reconsideration, Hannaford submitted a brief to the Board, and attached to that brief, along with other exhibits, a fifteen-page letter from Robert L. Ballew, a registered professional engineer. That Ballew letter, which took issue with the methods and conclusions of the Altenburg letter, especially its sight distance conclusions, provided further support for the Board's finding that Hannaford had planned adequately for traffic movement in and out of its proposed shopping center. The Ballew letter was based both

---

**2.** [Footnote added] As used by the Board, a traffic "sight distance" appears to mean the distance between the spot where a driveway enters a roadway and the spot in a given direction along that roadway where the driver of an approaching automobile can first see and be seen by a driver pulling out of the driveway.

on data already on file with Ballew's engineering firm, Hunter-Ballew Associates, which had been collected for the preparation of an earlier report submitted to the Board in support of Hannaford's initial application ("the Hunter-Ballew report"), and on "new data" presumably collected for the specific purpose of refuting the conclusions of the Altenburg letter.

On January 13, 1982, with all parties present, the Board voted to reconsider its decision of October 28, 1981, but to limit the reconsideration to the issues of actual and required sight distances and other traffic problems. Following the Board's vote to reconsider, counsel for the petitioners, that is, Gulick and the others opposing the Hannaford development, argued their case to the Board, referring now and then to the Altenburg letter; and a Hannaford representative delivered a counterargument, relying in part on the Ballew letter. At the conclusion of the arguments, the Board voted to "affirm" its previous approval of the Hannaford project subject to certain additional conditions. The Board's written findings of fact and order, also dated January 13, 1982, summarized the contents of both the Altenburg and the Ballew letters and specifically noted, "The petitioners have offered new or additional evidence on traffic considerations." The Board then went on, however, to make the following finding: "Site [sic] distances as proposed by the applicant on plans entitled 'Back Cove Plaza, Preble Street, Portland, Maine, Grading Plan dated April 2, 1981,' are adequate for safe traffic movement." The Board also found that "[e]xisting roadways are capable of assimilating traffic generated by the project provided improvements as noted

in section IX of the Hunter-Ballew report dated November, 1980, are completed prior to operation of the project."[3] On the basis of those findings of fact, the Board concluded once again that "the applicant has made adequate provisions for traffic movement of all types into or out of the development area" and affirmed its order of October 28, 1981, subject to the additional requirement that the improvements as recommended in the original Hunter-Ballew report be carried out before the shopping center opens for business. The present appellants challenge the adequacy of the administrative record to support the Board's order of October 28, 1981, as modified and affirmed by its order of January 13, 1982.

## II. *Extent of the Record*

Appellants, contending that the Board's orders were not supported by substantial evidence on the whole record, argue as a preliminary matter that the only evidence *in* the record, and thus that the only evidence to which a reviewing court can look for support of the Board's conclusions, is the evidence presented during or before the Board's hearing of June 13, 1981. In other words, they claim that the Ballew letter, presented to the Board during the reconsideration process, may not be relied upon as "evidence" in support of the Board's ultimate decision. We disagree.

◼ The record upon which the Board may legitimately base a decision is not ordinarily confined to testimony or exhibits formally admitted at a full-scale trial-type hearing. 38 M.R.S.A. § 344(5), which governs the reconsideration process, states that upon receipt of a petition for reconsidera-

---

**3.** Section IX of the November, 1980, Hunter-Ballew report recommended that changes be made to the "phasing" or timing of existing traffic lights at the intersections of Forest Avenue, Baxter Boulevard, and Bedford Street and of Preble Street and Marginal Way, both near the shopping center site. Section IX also advised the creation of two exclusive left-turn lanes: one for traffic turning onto Bedford Street from Forest Avenue, together with a "rumble strip" to help motorists turning left from Baxter Boulevard onto Forest Avenue, and the other for traffic turning left onto Mar-

ginal Way from the southbound lane of Preble Street. Finally, section IX recommended that all of the shopping center's exits and entrances incorporate certain standard design features prepared by the Maine Department of Transportation. The Board's order of January 13, 1982, quotes only that portion of section IX relating to signal phasing improvements, and thus it is not clear whether the Board intended to condition its approval on those signal changes alone or on the completion of all of the section IX recommendations.

tion the Board may "grant the petition in full or in part, order a public hearing or dismiss the petition," thus indicating that the petition may be granted or dismissed without any "live" evidentiary hearing. If the Board elects to proceed without such a hearing, it may nonetheless base its decision on information submitted along with the petition and made a part of the record in that manner. *Cf. In re Belgrade Shores, Inc.,* 371 A.2d 413, 416 (Me.1977) (where Board held no hearing before approving Belgrade's site permit application, appellate court must look to information submitted with Belgrade's application "and reasonable inferences drawn therefrom" when reviewing Board decision to determine whether it was based upon substantial evidence on the whole record). By the same token, the Board is free to consider documentary evidence, such as the Ballew letter, submitted in response to the petition for reconsideration.

■ Furthermore, petitioners at no time in connection with their petition for reconsideration requested a trial-type hearing at which the new documentary evidence already presented by themselves and by Hannaford could be formally introduced through live witnesses and at which those witnesses could be subjected to cross-examination. On the contrary, the petitioners participated before the Board in the reconsideration proceeding in which all parties, as well as the Board, apparently took as a given the fact that both the Altenburg and the Ballew letters had already been added to the record to be considered by the Board. They now are in no position to argue that the Board could not depend upon the Ballew letter to support its order of January 13, 1982, as they themselves rely heavily on the Altenburg letter—which, like the Ballew letter, was submitted to the Board after its decision of October 28, 1981, and was never cross-examined [4]—to support their

claim that the Board's second order was not supported by substantial evidence on the whole record. This court held in *Warren v. Waterville Urban Renewal Authority,* 235 A.2d 295, 299 (Me.1967), *cert. denied,* 390 U.S. 1006, 88 S.Ct. 1249, 20 L.Ed.2d 105 (1968), that "[a] party cannot claim aggrievement from trial conduct which he actively seconded or tacitly tolerated." Just so, appellants may not now complain about the Board's approach to documentary evidence, when they themselves have accepted the benefits of that approach.

■ We do not intend to imply here that the Board's October 28, 1981, findings were not supported by the evidence before the Board on that date, or even that the Board's January 13, 1982, findings would not have been supported by the evidence presented prior to the filing of appellants' reconsideration petition. We are simply pointing out that we need not confine ourselves to the pre-reconsideration evidence in reviewing the two orders. The Board may properly base a reconsideration decision under section 344(5) upon documentary evidence submitted by interested parties both in favor of and opposed to the petition for reconsideration—at least where, as here, the present complaining parties never made a request for a trial-type evidentiary hearing, but rather argued their case on the basis of the newly presented documentary materials.

### III. *Evidentiary Support for the Board's Decision*

■ Under the Maine Administrative Procedure Act, a finding of fact by an administrative agency may be overturned only upon a showing by a challenger that it was "unsupported by substantial evidence on the whole record." 5 M.R.S.A. § 11007(4)(C)(5) (1979). This standard of review is identical to the "clear error" stan-

---

4. It is true that the Altenburg letter, unlike the Ballew letter, was ostensibly based entirely upon plans and testimony previously submitted to the Board and already a part of the administrative record. Nonetheless, because it contained a synthesis of that preexisting evidence

and drew new conclusions from that evidence, it must be considered new evidence itself. An expert opinion—which is really what the Altenburg letter expresses—is evidence, not merely argument.

dard used by the Law Court to review factual findings by a trial court. *See Sanford Highway Unit of Local 481, Council No. 74, AFSCME v. Town of Sanford,* 411 A.2d 1010, 1013 (Me.1980); Field, McKusick & Wroth, *Maine Civil Practice* § 80B.6 (Supp.1981). The reviewing court must determine "whether the [administrative] record contains competent and substantial evidence which supports the result reached." *In re Maine Clean Fuels, Inc.,* 310 A.2d 736, 741 (Me.1973). At the same time, "[t]he fact that the record contains inconsistent evidence or that inconsistent conclusions could be drawn from the record does not prevent the agency's findings from being sustained if there is substantial evidence to support them." *Seven Islands Land Co. v. Maine Land Use Regulation Commission,* 450 A.2d 475, 479 (Me.1982).

In this case, appellants concentrate their principal attack on the Board's findings of actual sight distances at the proposed shopping center's three driveways giving access to public streets. Essentially, they argue that the distances found by the Board in its order of October 28, 1981 (and incorporated by reference in its order of January 13, 1982) are unsupported by the record, and therefore that the Board's ultimate finding as to the adequacy of Hannaford's traffic plans is also flawed. We agree with appellants that the Board's ultimate factual finding—that Hannaford "has made adequate provision for traffic movement of all types out of or into the development area"—cannot stand if the Board's underlying findings are not warranted by the evidence. *See generally Gashgai v. Board of Registration in Medicine,* 390 A.2d 1080, 1085 (Me.1978). We are not persuaded, however, that there is anything amiss with either the underlying or the ultimate factual findings of the Board on the traffic issue.

■ On Forest Avenue, the Board found an actual sight distance to the left of "620 plus feet."[5] The Ballew letter, prepared by Hannaford's expert, stated that the actual sight distance at that spot was 900 feet.

The Altenburg letter gave the figure as 160 feet. In view of this range of expert evidence, we cannot say that the Board's finding is clearly erroneous. The Board was in the best position to assign appropriate weight to the widely conflicting opinions of the two experts, particularly in light of the other testimony it had heard, including the testimony of William Bray, Portland City Traffic Engineer. The Board also had before it maps and plans of the site itself, from which it could independently test the accuracy of the two experts' results. A factfinder in a case like this is not confined to choosing one or the other of two conflicting professional estimates; it is free to make an independent finding of fact. Like a jury, an administrative factfinder is "not restricted to a choice between the estimates of the two warring experts." *Warren v. Waterville Urban Renewal Authority, supra* at 305. *See also F.X. Bilodeau Realty, Inc. v. Lewiston Urban Renewal Authority,* 237 A.2d 398, 400 (Me.1968); *Kittery Electric Light Co. v. Assessors of Town of Kittery,* 219 A.2d 728, 738 (Me.1966); *Sinclair v. Home Indemnity Co.,* 159 Me. 367, 374, 193 A.2d 177, 180 (1963).

Nor can this court quarrel with the Board's conclusion that the actual sight distance it found on Forest Avenue—at least 620 feet—is adequate for safe traffic movement. Minimum safe sight distances are a function of road size and speed and of the type of vehicles using the roadway. The Board had before it ample evidence of those factors and was more than justified in concluding that a left sight distance of "620 plus" feet was safe. In fact, Portland Traffic Engineer Bray gave 380 feet as the required sight distance for dry pavement and 437 feet as the required sight distance for wet pavement.

The factual disputes over the sight distances at the other two shopping center driveways are similar to the Forest Avenue question. On Baxter Boulevard, the Board found an actual sight distance of "420 plus" feet in each direction. The Ballew letter

5. Because the Forest Avenue driveway may be used by motorists leaving the center for right turns exclusively, only the left sight distance from that exit is relevant to the safety question.

gave those distances as 470 feet to the right and 450 feet to the left, while the Altenburg letter said the correct figures were 440 to the right and 530 feet to the left. The Board's conclusion thus is more conservative than the conclusions of both experts. The Board was also justified in its implied conclusion that sight distances of "420 plus" feet are adequate for the Baxter Boulevard driveway. Although even the Ballew letter, prepared by Hannaford's expert, stated that minimum safe sight distances on Baxter Boulevard would be 350 feet to the right and 440 feet to the left (20 feet longer than the Board's finding of the actual sight distance to the left), the Board was not bound by the experts' opinions in determining whether a given sight distance is adequate or not. The conclusions in the Ballew letter were premised on Ballew's assumption that traffic on Baxter Boulevard travels at 35 miles per hour. City Traffic Engineer Bray testified before the Board on June 12, 1981, that the speed limit on Baxter Boulevard was 25 miles per hour, that sight distances of 200 feet in each direction would be adequate for traffic moving at that speed, and that the cars on Baxter Boulevard actually move at about 30 miles per hour. The Board may well have believed that traffic on Baxter Boulevard travels more slowly than Ballew assumed, and thus that actual sight distances of 420 feet in each direction are adequate for the Baxter Boulevard driveway.

On Preble Street, the Board found the actual sight distance to be "720 plus" feet in each direction. That finding falls well within the range of estimates tendered by the experts. The Ballew letter gave the actual sight distances at the Preble Street driveway as 1500 feet to the right and 870 feet to the left, whereas the Altenburg figures were 300 feet to the right and 316 feet to the left. Minimum required sight distances, according to City Engineer Bray

and the Altenburg letter, are 506 feet to the right and 437 feet to the left.

The Board's findings as to the adequacy of the sight distances at each of the center's driveways are supported not only by the specific figures used by the Board, but also by the expert opinion of the traffic engineer for the City of Portland, William Bray, the only traffic expert heard from in this case who was not in the employ of either of the contesting parties. Bray testified consistently that sight distances at each of the center's access points would be adequate. The function of a court in judicially reviewing the decision of an administrative agency such as the Board of Environmental Protection is a limited one.[6] The Board's factual findings as to sight distances need not have been the only conclusions it could have drawn from the evidence before it, nor need they be the same conclusions this court would have reached on the same record. As the Superior Court noted, a court must uphold the orders of an administrative agency if they are based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Maine Clean Fuels, Inc.,* *supra* at 741. Judges may not substitute their judgment for that of the agency merely because the evidence could give rise to more than one result. *Id.; Seven Islands Land Co. v. Maine Land Use Regulation Commission, supra* at 479; 5 M.R.S.A. § 11007(3) (1979). The Superior Court applied the correct standard in reviewing the Board's sight distance findings in this case; and after a thorough review of the record made before the Board of Environmental Protection, we hold that the Superior Court did not err when it ruled that those findings are supported by substantial evidence on the whole record.

We also must reject appellants' other challenges to the Board's conclusion that Hannaford had met the statutory standard

6. The Law Court approaches the question whether the administrative record adequately supports the administrative findings in exactly the same manner as does the Superior Court in the first instance. *See City of Bangor v. A.F.S. C.M.E., Council 74,* 449 A.2d 1129, 1134–35

(Me.1982). No special deference is accorded to the Superior Court's decision, whether it upheld or vacated the administrative decision. *See Thornton v. Lothridge,* 447 A.2d 473, 474 (Me.1982).

of making "adequate provision for traffic movement of all types out of or into the development area." They contend that the flow of shoppers in automobiles to and from the proposed shopping center will clog the surrounding streets with traffic and in particular will cause motorists to perform dangerous "weaving" maneuvers between the lanes on Forest Avenue. On this issue the opposing parties' experts expressed contradictory views, and the Board as the fact-finder was entitled to give credence to the opinion of the Hannaford experts. In fact, the Board would have been justified in questioning much of the Altenburg letter, including but not limited to its sight distance conclusions. Although the Altenburg letter stated that it was based only upon data contained in the documents and testimony previously presented to the Board, many of its factual assertions simply are not borne out by that existing evidence. Its recitations of existing traffic flow patterns on the public streets surrounding the planned shopping center, for instance, are not supported by the findings of the Hunter-Ballew report of November, 1980, or by traffic impact analyses conducted by Storch Engineers for Hannaford in 1977 and 1979. Hunter-Ballew and Storch are the only experts whose full reports were before the Board and who conducted their own traffic counts at the site to collect data.

The Board's responsibility was to review all of Hannaford's plans for traffic safety, and the record demonstrates that it had before it ample evidence from which it could ultimately conclude, as it did, that Hannaford's proposal makes adequate provision for traffic into and out of the planned shopping center. That evidence included not only the Hunter-Ballew and Storch reports and the Ballew letter, but also the expert opinion of City Traffic Engineer Bray and documentary evidence that Hannaford's traffic plans had passed muster with the Maine Department of Transportation and the Portland Planning Board. On the state of this record, no court has any right to interfere with the decision arrived at by the Board of Environmental Protection, which alone has been invested by the legislature with authority to determine the adequacy of traffic arrangements at proposed developments.

■ Finally, appellants argue that it was improper for the Board to condition its approval of Hannaford's application on future changes to be made on the public streets near the proposed shopping center. We see nothing wrong with such a decision by the Board, which has express statutory authorization to approve an application "upon such terms and conditions as the board may deem advisable to protect and preserve the environment and the public's health, safety and general welfare." 38 M.R.S.A. § 484 (Supp.1982). It is true that only the City of Portland has the authority to make the changes in the public streets required by the Board's order to be carried out before the Hannaford project can commence operations; Hannaford by itself cannot meet those conditions. From the point of view of the public's safety and well-being, however, it makes no difference who effects the mandated changes. The Board is free to set any conditions that fall within the range of its statutory authority. If any of those conditions require action by someone other than the applicant itself, it is up to that applicant to get whatever agreements or guarantees it needs to assure that its development will not later be held up by someone else's default.

For the foregoing reasons, the entry must be:

Judgment affirmed.

All concurring.