STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, SS                                       CIVIL ACTION
                                                   DOCKET NO. AP 14-43

CHARLES L. FARRELL,
          Petitioner

          v.                                       ORDER

MAINE UNEMPLOYMENT
INSURANCE COMMISSION,
          Respondent


Petitioner Charles L. Farrell filed a M.R. Civ. P. 80C appeal from the decision of the State of Maine Unemployment Insurance Commission ("Commission") denying Petitioner unemployment benefits because he made false statements in his applications to obtain unemployment benefits. Specifically, the Commission found that Petitioner represented that he was not working or receiving pay when, in fact, he was working and entitled to pay, but chose to defer payment so that he could continue to receive unemployment benefits. As discussed in greater detail below, the Court sustains Petitioner's M.R. Civ. P. 80C Appeal and reverses the Commission's Decision because the Decision was not supported by substantial evidence on the record as a whole and did contain errors of law.

Petitioner was laid off from a position at Know Technology, LLC on March 11, 2009. He applied for unemployment benefits the following day. Using the Department of Labor's internet-based system, Petitioner filed weekly claims for the weeks ending April 11, 2009 through August 28, 2010. From the weeks ending

1

September 4, 2010 through November 20, 2010, Petitioner filed claims through Extended Benefit Claims Cards, which he signed. For each week, the Petitioner answered the question, "Did you work or earn wages during the week?" with a no. During this time, he received weekly benefits in the amount of $344.00 plus $25 in Federal Additional Compensation.

In April 2009, Petitioner and a business partner, Kevin Cloutier ("KC") began a new venture that operated under the name Network Support Partners, LLC (the "Company"). The Company's Articles of Organization were filed on April 13, 2009 and its business was described as a "limited liability company that provides IT technical support services." Petitioner served as the Company's Registered Agent. Earlier that month, KC and the Petitioner entered into a Partnership Agreement, which provided, in pertinent part:

> The initial capital of the partnership shall consist of cash to be contributed by the partners in the form of their individual payment of business-related starting-up expenses and deferment of a standard base salary, commission payments, and bonus payments until such time as both agree to cause [the Company] to reimburse the partners for the accrued business expenses and until such time as both agree to cause [the Company] to initiate payment of compensation. Both Partners agree to submit business expense reports at least monthly.

The Agreement further provided that:

> Partners are entitled to draws from expected partnership profits. The amount of each draw will be determined by a vote of the partners. The draws are recoverable (that is, if sufficient profit is not available to pay the draw and provide the necessary cash for the next period's continued operation of the business, the amount of the draw is treated as a no-interest loan and the amount of the draw deducted from the partner's future compensation) and shall be paid on no greater frequency than monthly.
>
> ...

2

> In determining the amount of profits available for distribution, allowance will be made for the fact that some money must remain undistributed and available as working capital as determined by all partners.

Petitioner's former business partner, KC, brought an allegation of fraud or misrepresentation to the attention of the Bureau of Unemployment Compensation. In particular, KC alerted the Bureau to an email dated April 27, 2009 from Petitioner to KC in which Petitioner stated, in pertinent part:

> > tomorrow I'm stuck in a half-day unemployment session (one-maybe two benefits....first, those unemployment checks are part of the reason we don't have to pay me in 2009 and second – I hope to plead my case for the State to approve the notion of starting a company – which continues the dollars and removes the rest of the bureaucracy.

Unemployment Claims Fraud Investigator, Paul Jerome, asserted that Petitioner told the Deputy—in charge of the initial determination—that he worked approximately 15 to 20 hours per week for the Company. On June 11, 2013, Petitioner wrote a letter to Mr. Jerome estimating that he worked 10-15 hours a week for the first six month's of the Company's existence and no more than 10 hours per week after that time. This alleged correction was disregarded or overlooked by the Commission.

On April 15, 2009, Petitioner completed an application for Maine Enterprise Option ("MEO"). The MEO was designed as a means to assist people who wished to become self-employed and met criteria to allow them to be eligible for collecting regular unemployment benefits while participating in the program. Petitioner's application was denied on May 8, 2009. Petitioner did not appeal this denial.

3

In 2009, the Company's IRS 1065 indicated it had ordinary business income of $11,332.16. As of December 31, 2009, Petitioner owned 40% of the Company and KC owned the other 60%. Petitioner reduced his ownership interest in the Company from 40% to 25% on July 1, 2010. In 2010, the Company had ordinary business income of $25,511.67 and in $2011 income of $833.40. Petitioner asserts that aside from $1.00 for transferring a logo that he owned to the Company, he did not receive any form of wages, reimbursement, or compensation from the Company. Petitioner, however, brought a small claims action against KC to recover some money from the Company. In fact, he obtained two judgments of $6,000 on or about March 17, 2013 for two periods. Petitioner did not, however, receive the $12,000. Instead, he received a check for $150 that he has yet to cash. Petitioner did not disclose the business income shown on the income tax records, the judgments totaling $12,000, or the $150 check to the Bureau of Unemployment Compensation or the Commission, although Petitioner believes he made Mr. Jerome aware of them and testified he knew his obligation to report any cash received on the judgments to the Depart of Labor.

KC testified that while there were not weekly or monthly paychecks, compensation could have been to Petitioner. KC asserts that if Petitioner had chosen, he could have received some form of compensation for the services he performed for the Company. KC testified, however, that Petitioner requested to defer the payment: "[Petitioner] didn't want to be paid just to – our goal was to build the company up and to sell it, pretty much." When subsequently asked why

4

Petitioner wanted to defer payments, KC testified that he did not believe Petitioner told him why:

> I might have – I'd have to review my emails. I believe the only one that there was, was the [April 27, 2009 email]. Where he pretty much said it was 'cause he's collecting unemployment.

On June 3, 2013, the Bureau contacted Petitioner to indicate that his unemployment claim had been audited. On June 18, 2013, the Deputy issued a decision concluding that Petitioner was disqualified from April 5, 2009 to November 20, 2010 from receiving benefits, was ineligible for benefits from June 18, 2013 through June 13, 2014, received an overpayment of $31,365, and must also repay a 50% penalty of $15,682.50 for a total of $47,047.50 that must be repaid. This ruling was based on the Deputy's findings that the Petitioner knowingly made false statements or knowingly failed to disclose material facts in his application for benefits. In particular, the Deputy explained that documentation indicates the Petitioner worked for the Company and received a share of money for this work even though it was intentionally kept in the Company bank account.

On July 1, 2013, Petitioner appealed the Deputy's Decision to the Maine Department of Labor, Division of Administrative Hearings. On August 19, 2013, a hearing was held in which two issues were presented: 1) Whether Petitioner made a false statement or representation knowing it to be false or knowingly failed to disclose a material fact in his application for benefits under Section 1193(6) of the Employment Security Law; and 2) Whether Petitioner was paid benefits in error under Section 1194(10) of the Employment Security Law. On August 23, 2013, Administrative Hearing Officer Maura R. Bragg issued a decision affirming the

5

Deputy's finding that Petitioner "knowingly made a false representation under Section 1193(6) of the Employment Security Law" and was thus disqualified for benefits.

Petitioner appealed that decision to the Commission on August 30, 2013 and on January 14, 2014, a hearing was held. On April 28, 2014, the Commission issued a 2-1 Decision finding that Petitioner "knew or should have known that since he was, in fact working and that he was entitled to pay for his work that he must report the earnings when filing his weekly claim."(emphasis supplied). It elaborated that Petitioner "specifically requested that the payments from the [Company] that he was entitled to during the timeframe that he was receiving unemployment compensation be deferred" and that Petitioner "made a conscious choice to seek payment for services rendered at a later time." This conclusion was supported only by Petitioner's April 27, 2009 email to KC "because it demonstrates that the [Petitioner] requested the deferral specifically to avoid having the [C]ompany pay him any wages during the period in question." Indeed, the Commission found the fact that Petitioner sued KC for payment and received two judgments additional evidence that he was working and expected to be paid. The Commission also dismissed Petitioner's argument that he asked Bureau officials if what he was doing was correct as unpersuasive because there was no evidence that he told the Bureau that he was in fact working for pay, but simply requesting payment at a later date.

On May 2, 2014, Petitioner filed a request for reconsideration, which was denied, with a dissent from Commissioner O'Malley. Thereafter, Petitioner timely appealed to the present Court.

6

The Court understands it "will not overrule findings of fact supported by substantial evidence, defined as 'such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion.'" *Lewiston Daily Sun v. Maine Unemployment Ins. Comm'n*, 1999 ME 90, ¶ 7, 733 A.2d 344 (quoting *Crocker v. Maine Unemployment Ins. Comm'n*, 450 A.2d 469, 471 (Me. 1982)). When conflicting evidence is presented, such conflicts are for the fact finder to resolve. *Bean v. Maine Unemployment Ins. Comm'n*, 485 A.2d 630, 634 (Me. 1984). In particular, credibility determinations are "exclusively the province of the Commission and will not be disturbed on appeal." *Sprague Electric Co. v. Maine Unemployment Ins. Comm'n*, 544 A.2d 728, 732 (Me. 1988). Stated differently, the Court may not substitute its judgment for that of the agency merely because the evidence could give rise to more than one result. *Dodd v. Secretary of State*, 526 A.2d 583, 584 (Me. 1987) (citing *Gulick v. Bd. of Envtl Protection*, 452 A.2d 1202, 1209 (Me. 1982)). "The burden of proof clearly rests with the party seeking to overturn the decision of an administrative agency." *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 479 (Me. 1982) (citation omitted). However, this court need not accept errors of corporate or partnership law as applied to the evidence on the record.

Petitioner argues that the Commission committed legal error by finding that it was appropriate to bring the present case of unemployment insurance fraud over three years after the alleged act occurred. In particular, Petitioner contends that the present dispute is controlled by the three-year statute of limitations applicable to Class E crimes. (citing 17-A M.R.S. § 8(2)(B)). Petitioner argues that the three-year

7

statute of limitations applies because unemployment compensation fraud is identified as theft by deception, a Class E crime.

The Commission responds that no statute of limitations applies to findings of a false statement or misrepresentation under 26 M.R.S. § 1193(6) The proceedings before the Commission were civil proceedings that do not fall under Title 17-A.

The Court rejects Petitioner's argument because the plain language of 17-A M.R.S. § 8(2)(B) makes clear that its three-year statute of limitations applies to criminal, not civil proceedings before the Commission and the Court. The mere fact that a civil violation also gives rise to a criminal charge does not, in itself, impute the criminal statute of limitations to the civil proceeding.

The Commission determined that Petitioner was disqualified from receiving benefits pursuant to 26 M.R.S. § 1193(6). Section 1193 provides, in pertinent part:

> For any week for which the deputy finds that the claimant made a false statement or representation knowing it to be false or knowingly failed to disclose a material fact in the claimant's application to obtain benefits from any state or federal unemployment compensation program administered by the bureau. In addition, for a first or 2nd occurrence, the claimant is ineligible to receive any benefits for a period of not less than 6 months nor more than one year from the mailing date of the determination, and the commissioner shall assess a penalty of 50% of the benefits falsely obtained for the first occurrence.

26 M.R.S. § 1193(6).

Petitioner contends the Commission's finding of a false statement or representation is not supported by the record because: 1) the standard the Commission attempts to employ—that an individual should and can report work without simultaneously reporting earnings—is not an acceptable command under the Department's online reporting system; 2) Petitioner reported the activities he

8

was participating in to the Department and they informed him that such "work" was permissible; and 3) Petitioner did not receive any wages or other monetary compensation for the services he provided to the Company.

Specifically, Petitioner argues that the software the Department uses to process claims submitted online does not permit an individual to report that they worked, but did not earn any income from such work. Petitioner argues the Commission's finding that Petitioner knew or should have known that he was working and entitled to pay, although not receiving any earnings, is not supported by substantial evidence on the record as a whole.

The Commission responds that Petitioner's argument that the claims system did not allow a report of work without corresponding earnings ignores the fact that Petitioner did have earnings, but chose to put them back into the business, "in part so that he could collect unemployment benefits." This is contrary to the explanation in Maine's Unemployment "Blue Book" that a claimant should report earnings the week in which the work is done, not when payment is received. In particular, the Blue Book provides that "[i]f you were paid for an 'odd job' and you cannot provide written verification of your earnings, report your earnings for the week in which you did the work, regardless of when you are paid." The Commission also points out that Petitioner's argument ignores the fact that when Petitioner received extended unemployment benefits, from September 4, 2010 to November 20, 2010, he filed claims on an Extended Benefit Claims Card. On this card, the Commission contends, Petitioner could have checked "yes" and put a zero in the blank for gross earnings. Finally, the Commission argues that since the Petitioner expected to receive

9

earnings at some point, he should have calculated his anticipated earnings and reported them each week.

Petitioner points out that there is no dispute that he reported the work he was doing for the Company. Indeed, Petitioner contacted Bureau representatives at least nine times during the course of his unemployment to confirm that he was properly completing the paperwork and, each time, was told that he could continue with his volunteer activities and work at the Company without reporting them as long as he remained able and available to work and did not receive earnings or wages. This is consistent with the on-line system not allowing a user to answer "yes" to question 6 without reporting any income. As the Bureau representatives indicated, it is the income or the earnings, not the work itself, that makes the activity reportable. Because there was no testimony indicating that working, without immediate pay, must be reported, the Commission lacked substantial evidence to find that the Petitioner *knowingly* made a false representation.

Regarding Petitioner's point that he relied upon the advice of the Bureau of Unemployment Compensation, it complains that the Petitioner left out the fact that he could have been paid, but chose to defer such payment. The Commission notes that it also appears that Petitioner asked the question about such work in the context of volunteer work he performed. The Commission argues that a misunderstanding about how advice should be used does not negate the Petitioner's obligation to follow the applicable law. (citing *Pankey v. Maine Unemployment Ins. Comm'n*, 2013 Me. Super. LEXIS 199 *6-7 (Oct. 8, 2013).

10

Petitioner argues that he did not receive any payment for work from the Company, nor did he refuse payments in order to create an entitlement for unemployment. In addition, as of the present date, Petitioner has not received any money from the Company—aside from a $1.00 payment as a result of the sale of a trademark—and is unaware of what happened to any money the Company had prior to its wind up. Furthermore, Petitioner argues that the record does not support the Commission's finding that there were funds available to compensate him. Indeed, the Company's history clearly demonstrates that Petitioner never received any form of compensation for his contributions to the Company. Furthermore, Petitioner argues the Partnership Agreement, in paragraph 5, states that "[i]n determining the amount of profits available for distribution, allowance will be made for the fact that some money must remain undistributed and available for working capital as determined by all partners. While the Company reported income at the end of multiple years, "there is no evidence to support a conclusion that the income could have been distributed and the business would have remained operable."

The Commission responds `that Petitioner's intent to misrepresent the facts is evidenced by his email to KC that his "unemployment checks are part of the reason we don't have to pay me in 2009." While the Commission acknowledges that this statement was made while an application for the MEO program was pending and that the program would have allowed Petitioner to become self-employed and remain eligible for unemployment benefits, the Commission points out that this

11

application was denied. Similarly, the Commission points to testimony of KC that the Company could have remained operable and distributed income to Petitioner.

The Commission points out that while the Petitioner asserts that he did not expect any money from the business in the short term, the tax returns and judgments he obtained against KC indicate that the business earned money. The Commission points to Petitioner's testimony that he "never" received any money from the partnership, even though he received a check for $150 and two judgments for $6,000 each. While Petitioner attempts to downplay the significance of the $150 check because he did not cash it, the Commission contends that this constitutes valid evidence in support of its finding that Petitioner had a subjective intent to misrepresent his work and deferred earnings.

Petitioner replies that insofar as KC testified that Petitioner chose to defer any partnership payments for his work, that statement is not supported by the Partnership Agreement itself, which provides that a draw—i.e. payments—must be determined by a vote of the partners—meaning KC would have to decide whether Petitioner was paid—and that a significant amount of funds must "remain undistributed and available as working capital," as the nature of the business required a large amount of working capital.

In addition, Petitioner contends that the judgments he obtained were only done after the Company ceased operations. These payments, Petitioner argues, were found "irrelevant" by the Hearing Officer as outside the period in time in question and, even if relevant, were pursuant to a small claims judgment, which would account for different taxable reporting standards than wages for work performed.

12

Petitioner further argues that while the Court must accept the Commission's credibility determinations, it must also determine whether the Petitioner had a subjective intent to deceive the Commission. Petitioner argues that in this case, there is no evidence that Petitioner understood work and earnings to be linked terms. In addition, Petitioner argues that the Commission did not take Petitioner's subjective understanding into account because it noted that Petitioner "knew or should have known." Furthermore, the only evidence that "may even partially support a finding of fraud or a knowing misrepresentation" was the April 27, 2009 e-mail from Petitioner to KC stating, in pertinent part that "those unemployment checks are part of the reason we don't have to pay me in 2009...." Petitioner argues that this email must be read in the context of the MEO program, which Petitioner applied for on April 11, 2009. This application was not denied until after the April 27, 2009 email was sent. Accordingly, Petitioner contends that at the time the email was written, he understood that the MEO program would provide the Company with start-up cost and still permit him to collect unemployment.

While the Commission wrote that Petitioner "knew or should have known" he made a false statement, the remainder of the Decision speaks in terms of Petitioner's actual knowledge and clarifies that "[i]t is found, for the reasons stated above that the [Petitioner] knowingly made a false representation under 26 M.R.S.A. § 1193(6) of the Employment Security Law and therefore, is disqualified for benefits under the law." (emphasis added); ("[Petitioner] made a conscious choice to seek payment for services rendered at a later time...there is no evidence that the

13

[Petitioner] ever told the Bureau that he was in fact working for pay, but simply requesting payment at a later date"). s

In response to the Petitioner's argument that he could not physically indicate on the Department's form that he worked, but did not earn any money, the Commission claims that Petitioner "should have calculated his anticipated earnings and reported them each week." In other words, the Commission implicitly found that the Petitioner worked, and earned more than zero dollars from the Company, for the weeks in question. *See Davric Me. Corp. v. Bangor Historic Track, Inc.*, 2000 ME 102, ¶ 9, 751 A.2d 1024 (discussing an agency's implicit conclusion); *Driscoll v. Gheewalla*, 441 A.2d 1023, 1029-30 (Me. 1982) (upholding agency finding because record implicitly supported such a finding even though no express finding existed). It relies on the Company's tax records and KC's testimony. In addition, the Commission doubted Petitioner's sincerity in attempting to fill in zero on the electronic form based on his treatment of the non-electronic extended benefit weekly claim forms. This is because Petitioner conceded that he could have, but did not, indicate on the extended benefit form that he worked, but did not receive any gross earnings.

Petitioner argues that the Commission's finding that he knowingly made a false statement is arbitrary and capricious because the Department's electronic unemployment benefit claims system does not allow the user to explain that he has worked, but not "earned" any money as a result thereof. In addition, Petitioner argues that defining "work" as not requiring "earnings" would open the door to a plethora of claims that fraud has occurred. Petitioner argues that the Commission's

14

distinction is unavailing as the only two things that are to be looked at is whether the individual worked and whether the individual earned wages. In this case, Petitioner argues, the record is clear that the Company never paid Petitioner any compensation or earnings.

As discussed *supra*, the Commission did not find the Petitioner should have indicated that he worked, but did not receive any wages. Instead, the Commission found that the Petitioner worked, earned wages, but purposefully deferred them so that he could continue to receive unemployment benefits. Implicit within this finding is the conclusion that Petitioner worked, and earned more than zero dollars from the Company, for the weeks in question.

Petitioner argues that the Commission's Decision is premised on adding an element into the statute which is not present: expectation. Petitioner points to language in the Commission's decision that the Petitioner "expected to be paid" and then argues that expectations, as a form of currency to buy and sell goods, is not recognizable. Petitioner then challenges the Commission's argument that he should have calculated his return by pointing out that "[h]ow one can calculate expectations remains unknown." In addition, Petitioner argues that the Commission's citation to *Pankey v. Me. Unemployment Ins. Comm.* 2013 Me. Super. LEXIS at 5, is unavailing as in that case, the individual had actual earnings as a sole owner, not the expectation of earnings. She was not subject to a sharing contractual agreement. The case that is most on point, Petitioner argues, is *Crocker* because the claimant in that case was working a similar amount of time and was ready, willing, able, and available to work full-time. In addition, the claimant in *Crocker* never

15

received any earnings or compensations, but there was an understanding or expectation that the work he was performing could provide benefits in the future—because Mr. Crocker co-owned the venture and the venture made payments to his wife.

Petitioner argues that the Commission's Decision is contrary to the Law Court's decision in *Crocker v. Maine employment Security Comm'n.*, 450mA.2d 469. The Commission argues that the holding of *Crocker* does not apply to this situation. The Law Court's reversal was based on stipulations, which have not been made in the present case. On the contrary, the facts in the present case are identical to *Crocker*.

In *Crocker v. Maine Employment Sec. Comm'n*, the claimant applied for unemployment benefits on June 16, 1980. 450 A.2d at 469-70. The Petitioner marked the "no" box to question 6, "did you work or earn wages this week." In late May 1980, the claimant and his wife jointly obtained a license for and opened up a Bait & Tackle Shop. *Id* at 470. At the time they obtained the license, they did not know the claimant would be laid off. After the claimant was laid off, on June 13, 1980, he did not work at the store or keep the books. *Id.* Several times a week he would drive his nephew to ponds where the boy caught bait to be sold in the shop. *Id.* At first, he showed his nephew how to catch each kind of bait. *Id.* The task of securing bait required two to three hours of time each day. *Id.* Based on the parties' stipulation that despite the fact that he was "working" 2-3 hours a day he was still available for work under the statute. On August 25, 1980, the claimant informed the Commission that "[a]ll I do is spend 2 or 3 hours a day supervising & overseeing the

16

business operations to include 2 or 3 hours a day fishing or procuring the bait supply." *Id.* Based largely on this statement, the deputy found that the claimant knowingly made a false statement, i.e. that he had not worked or earned wages and that he was able and available for work on each day during the time in question. *Id.* This decision was affirmed and appealed to the superior court. *Id.* at 471. While the appeal was pending, the parties submitted a partial consent decree in which they agreed that the decisions concerning the plaintiff's availability for work and his employment status were erroneous and should be reversed. *Id.* Nevertheless, the Superior Court found that the Commission's decision and facts were supported by substantial evidence and did not contain errors of law or an abuse of discretion. *Id.* On appeal, the Law Court explained that the parties' stipulation conceded:

> That the [claimant's] furnishing of his services in driving his nephew to the several ponds to gather bait for the bait and tackle shop operated by his wife and licensed as a joint business venture did not in fact and law render him unavailable for work, and that, notwithstanding such services, [claimant] was available for work within the meaning of the eligibility requirements of 26 M.R.S.A. § 1192(3). Also, the Commission was admitting that the furnishing of the reference services did not in fact and law nullify his unemployment status, another prerequisite of unemployment benefit eligibility....

*Id.* at 471-472. As a result of these concessions:

> A majority of the [Law] Court believes that we need not go further in our analysis. Simply put, the Court holds that the agreement of the parties in Superior Court, (1) that [claimant] was available for work and (2) that [claimant] was not employed, precludes any imposition of sanctions under 26 M.R.S. § 1051 or § 1193."

*Id.* at 473. This was because the partial consent decree established that the two statements found by the Commission to be false were not in fact false and it follows

17

that the claimant was in fact eligible for benefits and the nondisclosure of his bait-catching activities was not fraudulent. *Id.*

The current situation is no different, as the Petitioner has remained ready, able, and willing to work throughout the course of his unemployment. In addition, Petitioner worked approximately 10-15 hours per week, similar to the 14-21 hours per week Mr. Crocker worked. Indeed, Petitioner argues that Mr. Crocker obtained a benefit that the Petitioner did not insofar as Mr. Crocker's actions furthered a business venture he co-owned and which made payments to his wife. Despite these similarities, Petitioner contends that the Hearing Officer attempted to differentiate the cases by arguing that Petitioner spent approximately 20 hours a week soliciting sales from his business and thus "clearly performed services for his business while collecting unemployment benefits." This 20-hour assessment, however, is unsupported by the record as Petitioner clarified that he worked approximately 10 to 15 hours for the first six weeks, and then no more than 10 for the remaining time.

The Decision of the Commission cannot be sustained because it has ignored important evidence and principles of law. It does not recognize the true circumstance of the Petitioner in regard to his LLC.

The Commission's determination that Petitioner knowingly made a false statement is not supported by substantial evidence. The false statement found by the Commission at issue is Petitioner's representation that he was not working or receiving pay when, in fact, he was working and entitled to pay, but chose to defer payment so that he could continue to receive unemployment benefits.

18

The Commission's Decision claims it is supported by KC's testimony that Petitioner could have received some form of compensation for the services he performed for the Company, but chose not to because he was collecting unemployment. Indeed, KC explicitly testified that "had he chosen," Petitioner could have received some form of compensation for the services he performed for the Company on a weekly and/or monthly basis."[1] Petitioner contends there was not sufficient evidence to demonstrate that the Company could have paid him by distributing its income while remaining operable.

Since KC was the other partner in the Company and he testified that Petitioner could have been paid on a weekly and/or monthly basis, the Commission determined that Petitioner could have been paid a salary since the Partnership Agreement calls for the deferment of a standard base salary "until such time as both [partners] agree to cause [the Company] to initiate payment of compensation."

While credibility determinations are generally for the Commission, not the Court, ( *Sprague Electric Co.*, 544 A.2d at 732. ) a review of the testimony of both the petitioner and KC causes the court to question why KC's testimony was relied upon as it was directly contrary to the admitted documents. Most important, without a corporate/partnership vote to authorize earnings, how could the Commission determine the weekly or monthly salary? Farrell's "earnings" were never established. There is no evidence that petitioner *earned* anything; by the terms of his joint venture, he was contributing to an investment.

---

[1] "Had he chosen" is directly contrary to the partnership contract obligations.

19

A serious review of the record reveals that Mr. Farrell was not an employee of Network Support Partner, LLC. He was a part owner in the organization and was governed by the Partnership agreement with Kevin Cloutier, the other owner. As such, he advanced capital to the company as an investment. The evidence is undisputed that a crucial operating principle of the partners was to build the value of the company to effectuate a subsequent sale. The ability of either partner to realize funds from Network Support Partner was entirely dependent on a unanimous vote of both of them to reimburse expenses, create a salary or authorize a draw. The amount of such reimbursement, salary or draw needed the approval of both partners, an event which never took place.

Petitioner's efforts were entirely consistent with that of Mr. *Crocker*, 450 A.2d 469, in that his efforts of less than half or a quarter of the weekly working hours were spent building the business, (fishing for bait). He, like Crocker, was building equity in his investment. And, like Crocker, there is no evidence that Farrell was not ready, willing and able to accept employment at any time during the period in question. Absent affirmative action by the partners, his only "earnings" were a return on investment in the event the company was liquidated. There is no evidence of any record of the LLC that the partners formally authorized any payment. Further, Petitioner's State court claim against Cloutier was in the nature of a demand for accounting for the funds acquired by the entity during its business life, allegedly disposed of by the partner. The Commission totally ignored the partnership agreement, a vital item of evidence.

The court recognizes that the Petitioner sent an email to his partner in which he states that "<u>part of the reason</u>" he wasn't expecting a wage, expense reimbursement or a draw is because he was living on unemployment benefits. (emphasis supplied). The words would seem to express a fraudulent intent but it is the only affirmative evidence that could be interpreted that way. Mr. Cloutier made it clear that at no other time Farrell expressed his clear interest in retaining earnings in the venture rather than accept reimbursement because he was drawing unemployment benefits. Everything Mr. Farrell told the Commission investigator, the hearing examiner and the Commission was consistent with his understanding that his efforts were in building equity in a joint enterprise. They were consistent with his meetings with Department of Labor staff. He named the staff members. There is no evidence that the investigator or any one on Commission staff made any efforts to contact those named to substantiate or disprove his assertions.

It is axiomatic that the hearing examiner and the Commission are given great deference in assessing the credibility of the witnesses. But Mr. Farrell's testimony is entirely consistent with all the other evidence in the matter and was totally ignored, while Mr. Cloutier comes to the hearing suffering an adverse judgment by Mr. Farrell and a contempt order by the District Court for failure to cooperate with the disclosure proceedings some four months earlier. In fact, the testimony of KC is consistent with that of Farrell except it is contrary to the partnership agreement. Further, while the Petitioner is to be criticized for not advising the Department of the judgments received, it is not completely unreasonable for Farrell to wait until he

21

realized funds from his investment to report his legal obligation, if any, to reimburse for the benefits received.

This court recognizes that its review of the Commission Decision is "limited to determining whether the Commission correctly applied the law and whether its fact findings are supported by competent evidence". *McPherson Timberlands v. Unemployment Ins. Comm'n,* 1998 ME 177, 714 A.2d 818. The standard "is identical to the 'clear error' standard used by the Law Court",*Gulick v. Bd. of Envtl. Prot.,* 452 A.2d 1202, (Me. 1982). The court must not disturb the decision of the Commission "unless the record before the Commission compels a contrary result" Id. The court must examine the entire record in order to determine whether the Commission could fairly and reasonably find the facts as it did. See 5 M.R.S.A. §11007(4)(C)(5); *Clarke v. Maine Unemployment Ins. Comm'n,* 491 A.2d 549 (Me. 1985). The burden of proof is on the petitioner. *Bischoff v. Maine State Ret.Sys.,*661 A.2d 167(Me. 1995). The court may not substitute its judgment for that of the Commission simply because the evidence could give rise to more than one result. *Gulick,* 452 A.2d at 1209.

The court finds the Commission did not correctly apply the law because it ignored the Partnership Agreement, the limitations on the Petitioner's right to proceeds from the business entity and the lack of corporate action to authorize income to Mr. Farrell. There is no competent evidence that Mr. Farrell was legally entitled to a wage from Network Support Partners and it fails to consider that his access to funds could only come about as a result of partnership affirmative action

22

or a liquidation of corporate assets. The law and the evidence compels a contrary result.

The entry will be:

The petition is SUSTAINED; the Decision of the Maine Unemployment Insurance Commission dated April 28, 2014 is REVERSED.

The clerk may docket this order by reference.

September 11, 2015

JUSTICE, SUPERIOR COURT