STATE OF MAINE
YORK, ss.

SUPERIOR COURT
Civil Action
Docket No. AP-16-0037

TIBOR KORMENDY and
IBOLYA KORMENDY,

Plaintiffs,

v.

TOWN OF KENNEBUNK *et al.*,[1]

Defendants.

**MEMORANDUM OF DECISION
AND ORDER**

Tibor and Ibolya Kormendy filed this Rule 80B action seeking review of the

Kennebunk Board of Assessment Review's ("Board") November 4, 2016 denial of their

tax abatement appeal for the April 1, 2015 assessment date. During the pendency of

this appeal plaintiffs also sought judicial review of Board actions on tax abatement

requests pertaining to the same property in other years. For the reasons that follow,

the court grants the appeal, in part, with respect to the November 4, 2016 denial and

remands to the Board for further proceedings; and denies all other requests because

they are untimely and the court lacks jurisdiction to hear them.

**Background**

Plaintiffs own a single-family residence located at 17 Tideview Terrace in the River

Bend Woods Subdivision on the Mousam River in Kennebunk, Maine. It is identified as

---

[1] In addition to the Town of Kennebunk, the complaint names as a defendant the Kennebunk
Board of Assessment Review, Daniel Robinson (Assessor), Megan Verlander (Assistant Assessor)
and Barry Tibbetts (former Town Manager). The town itself is the only proper party defendant in
a tax abatement proceeding. *See Shawmut Inn v. Inhabs. Of Town of Kennebunkport*, 428 A.2d
384, 388 (Me. 1981); *Tax Assessor of Town of Sebago v. Drummond*, 402 A.2d 469, 470 (Me.
1979); *Assessors, Town of Bristol v. Eldridge*, 392 A.2d 37, 39-40 (Me. 1978).

1

Lot 4 on Tax Map 70 (the "Property"). (Def. Supp. R. 44-45.)[2] Plaintiffs contend that the topography of the Property mandates a lower assessment.

Plaintiffs first filed an application for tax abatement in the winter of 2015-2016 with the Town Assessor. (Def. Supp. R. 77.) The Assessor denied the application by letter on April 20, 2016. (Def. Supp. R. 77.) Plaintiffs appealed this decision to the Board on June 14 of the same year, seeking a reduction in the assessed value of the Property from $372,800 to $264,121. (Def. Supp. R. 2, 78, 85.) Plaintiffs included an appraisal done by Priority Appraisal USA, LLC that valued the Property at $375,000 as of August 24, 2012. (Def. Supp. R. 8-24.)

Hearing on plaintiffs' appeal was originally scheduled for August 2, 2016 but the Board sought to continue the hearing because its secretary and other staff were on medical leave. (Def. Supp. R. 26.) Mr. Kormendy consented to extend the time for a hearing until September 30, 2016. (Def. Supp. R. 28-29.) Mr. Kormendy inquired by email on September 9, 2016 "if the postponed hearing could be now scheduled?" (Def. Supp. R. 29). The Board secretary notified Mr. Kormendy by email on September 20, 2016 to inform him that a hearing had been re-scheduled for October 18, 2016; and the town believes he apparently responded on September 27, 2017 that he was "not available"[3] to attend a meeting on that date. (Def. Supp. R. 82.) He had also emailed a revised application to the Board the previous day "for our pending B.A.R. process." (Def. Supp. R. 30-35.) The Board scheduled a hearing for November 1, 2016. (Def. Supp. R.

[2] The Town submitted "Defendants' Supplemental Rule 80B Record" (cited herein as "Def. Supp. R.") to complete the record before the court and remedy deficiencies in the record filed by plaintiffs. See Footnote 4, *infra*.

[3] Mr. Kormendy disputes this characterization. At the November 1, 2016 hearing he stated: "[I] said it was not acceptable, because it was past the deadline. . . . [T]hey have to follow the rules." (Def. Supp. R. 82.)

82.) Notice of the November 1st hearing date was sent to Kormendy on September 29, 2016. (Def. Supp. R. 36-41.)

Plaintiffs did not respond to this notice. (Def. Supp. R. 82.) Instead, they filed the instant action for governmental review on October 12, 2016, providing a copy of the appeal to the Town Clerk. *Id.* By an October 26, 2016 email, Mr. Kormendy notified the Board that he believed the Board lacked jurisdiction over his abatement appeal. (Def. Supp. R. 43.) The Board responded to this email on October 27, 2016, stating that it retained jurisdiction and that the hearing was still scheduled for November 1, 2016. *Id.*

The Board went forward with the November 1, 2016 hearing. (R. 82.) Mr. Kormendy appeared, presented a copy of a revised application, objected to the Board conducting the hearing, and then left because he "did not want to jeopardize his court action." (Def. Supp. R. 76-80, 82-84.) The Board reviewed the written submissions from plaintiffs and the Town Assessor as well as hear oral testimony from the Assessor. (Def. Supp. R. 44-75, 85-89.)

The Assessor testified about recent sales and listings supporting the value of the Property as assessed. (Def. Supp. R. 88.) He addressed plaintiffs' argument regarding the topography of the Property and testified that in dealing with small properties abutting waterways it is the site location that gives the land value and not its slope towards the water. *Id.* He testified that the appraisal performed by Priority Appraisal USA, LLC valuing the Property at $375,000 was in line with the Property's $372,800 assessment. *Id.* The Assessor testified about the Town's assessment process, explaining use of the town-wide revaluation performed for the April 1, 2003 assessment date as the basis for the Town's current assessments and the changes that resulted from a re-designation of river-front property. (Def. Supp. R. 44, 87) The change resulted in an

3

increase of the assessed value of plaintiffs' Property from $341,400 to $372,800 for the April 1, 2013 assessment date. (Def. Supp. R. 44-48, 87.)[4]

Following deliberations, the Board voted unanimously to deny plaintiffs' appeal and adopt its written decision. (Def. Supp. R. 90.) The decision outlines the basis for the Board's conclusion that plaintiffs failed to prove a substantial overvaluation or that the Property was subjected to unjust discrimination. (Def. Supp. R. 90.) The Board found the Assessor's testimony credible and refused to find error in the assessment of the Property. (Def. Supp. R. 90.)

Plaintiffs filed their brief and the record with the court on November 14, 2016. The Town objected to the record as submitted by plaintiffs and subsequently filed the supplemental record noted above and its opposing memorandum.[5]

Plaintiffs have made numerous filings with the court, including: a motion for a trial of the facts, a motion for reimbursement for extra costs of service of process, a motion for writ or injunction, a motion to vacate a 2013 tax increase, a motion to order defendant to answer interrogatories, and a motion to suspend processing, all of which were the subject of earlier court orders in the case. Plaintiffs also filed a motion for leave to amend pleadings, which the court granted on July 5, 2017. *See* Order on Pending

---

[4] From April 1, 2003 until April 1, 2013, the Property was classified as Site Index "8." (Def. Supp. R. 44.) The Index was changed to "R" after a review of recent sales and after several inquiries brought to the Assessor's attention that some of the properties abutting the Mousam River were not properly classified as an "R." (Def. Supp. R. 44, 50-51, 88.) Plaintiffs' Property was one of the approximately 25 properties that had their Site Index adjusted to "R" for the April 1, 2013 assessment date. (Def. Supp. R. 44, 87-88.) All residential properties on the Lower Mousam and Kennebunk Rivers now have this Site Index. (Def. Supp. R. 52.)

[5] The Town objected to the record submitted by plaintiffs as deficient under Rule 80B on numerous grounds, including: (i) omission of evidence considered by the Board: (ii) omission of other content required by Rule 80B, including the Board's November 4, 2016 decision at issue in this appeal; (iii) inclusion of material not considered by the Board, or that had been altered; and (iv) no attempt to secure agreement on the filed record as required. *See generally* M.R. Civ. P. 80B(e). In light of the disposition of the appeal, however, this issue is moot.

4

Motions & Amended Briefing Schedule at 2.) The issues raised by the amended pleading are addressed in section 2, below.

## Discussion

### 1. November 1, 2016 Hearing

When a board of assessment review "fails to give written notice of its decision within 60 days of the date the application is filed, *unless the applicant agrees in writing to further delay*, the application is deemed denied and the applicant may appeal to Superior Court as if there had been a written denial." 36 M.R.S.A. § 843(1) (emphasis added). Once an appeal is filed with this court, "the authority of the tribunal to modify its decisions [is terminated] unless the court remands the matter to the tribunal for its further action, thereby reviving its authority." *Gagne v. Lewiston*, 281 A.2d 579, 583 (Me. 1971). 3 Harvey, *Maine Civil Practice*, § 80B.2 p.437 (2011 ed.) *See also Eastern Maine Medical Center v. Health Care Finance Comm'n*, 601 A.2d 99, 101 (Me. 1992); *Portland Sand & Gravel, Inc. v. Town of Gray*, 663 A.2d 41, 43 (Me. 1995); *York Hosp. v. HHS*, 2008 ME 165, ¶¶ 33-34, 959 A.2d 67.

The plain language of section 843(1) requires a written agreement to delay a hearing beyond the "deemed denied" date. Here, plaintiffs did not agree "in writing" to delay the hearing beyond September 30, 2016. Even if Mr. Kormendy informed the Board that he was not able to attend an October 18th hearing unilaterally scheduled by the Board (which he denies), that did not constitute a written agreement consenting to a continued hearing. His submission of a revised application on September 26th likewise does not, in itself, constitute an express, written agreement to a hearing beyond September 30th.

The Town contends that plaintiffs implicitly agreed to the November 1st hearing, and at oral argument referenced Law Court precedent upholding the principle that a

5

property tax review board does not lose jurisdiction if it acts beyond the 60-day "deemed denied" date and the taxpayer has not agreed in writing but rather has implicitly agreed to the review. Close examination of the Law Court precedent as well as the record in this case, however, lead the court to conclude that plaintiffs did not implicitly agree to the November 1st hearing.

Although the Law Court has not addressed this precise issue, it has decided two cases involving jurisdictional arguments based on "deemed denied" dates under related tax abatement statutes. Both cases are distinguishable from the instant case.

In *Vienna v. Kokernak*, 612 A.2d 870 (Me. 1992), 37 taxpayers who owned lake-front property appealed the town assessor's denial of their abatement requests to the county commissioners, who under 36 M.R.S. § 844 conduct *de novo* reviews of abatement determinations by assessors in towns that do not have a local board of assessment review. In *Vienna*, the county commissioners conducted a full hearing with the consent and participation of the taxpayers; determined that the properties had been over-assessed; and granted increased abatements. Their decision, however, was issued beyond the 60-day statutory period. The Law Court rejected the town's argument on appeal that the commissioners lost jurisdiction simply because they failed to issue their final decision prior to the 60-day "deemed denied" date in section 844.

In *International Woolen Co. v. Town of Sanford*, 2003 ME 80, plaintiff appealed the town assessor's denial of its abatement application to the town board of assessment review, and then appealed that board's "deemed denial" to the State Board of Property Tax Review, a legislatively-established, intermediate appellate tribunal that conducts a *de novo* review of board of assessment review decisions in cases involving nonresidential properties and other high-value properties. *See* 36 M.R.S. § 843(1-A). The Law Court rejected the town's argument that the taxpayer's appeal from the initial assessor's

6

decision was late, and thus deprived the State Board of jurisdiction to hear the appeal, because the operative date triggering the appeal period was not the "deemed denied" date but rather a later date expressly provided in the assessor's written decision. *Id.* at ¶ 15.

Thus, neither of the above cases involve the same situation as is presented here; and the record in the instant case does not establish that plaintiffs implicitly agreed to the November 1st hearing. Notwithstanding their submission of a revised application on September 26th, plaintiffs filed an appeal to this court on October 12th and emailed the Board on October 26, 2017 to indicate that the Board no longer had jurisdiction. Mr. Kormendy appeared at the November 1st hearing to express the same position. The court concludes that plaintiffs did not agree, explicitly or implicitly, to the November 1st hearing; the Board lacked jurisdiction to conduct the hearing on that date; and the November 4th decision based on that hearing is void.

This does not mean that the Superior Court should act in lieu of the Board and hold a *de novo* hearing, as Mr. Kormendy now urges. *See Rome & Carmel Forest Corp. v. Town of Rome*, No. CV-95-188, 1996 Me. Super. LEXIS 11 (Jan. 9, 1996) (*Alexander, J.*). The *Rome & Carmel Forest Corp.* case addressed this very question, and this court finds its rationale persuasive. Justice Alexander held that the Superior Court did not have such authority because it:

> "would essentially be substituted as the tax policy maker for local government. Such an interpretation would raise serious issues under Article III of the Maine Constitution. Local governmental agencies, first the town, then the County Commissioners, have original jurisdiction to hear and decide tax abatement appeal issues. The judicial function which the Superior Court performs is to review the determinations so made on an appellate basis, not to intervene and substitute its judgment in *de novo* hearing and decision making. The 'deemed denied' statutes, 36 M.R.S.A. §§ 842 and 844(1), do not require a contrary reading. They need not be interpreted to raises [*sic*] Article III issues by suggesting that if a hearing is not accorded at both levels, then the locality's original jurisdiction and tax policy making authority passes to the Superior Court.

7

*Id.* at *4. Thus, the matter was remanded to the board to develop a proper record and come to a decision. *Id.* at *4-5, *citing Sanborn v. Town of Eliot*, 425 A.2d 629 (Me. 1981); Harvey, Field, McKusick & Wroth, *Maine Civil Practice*, § 80B.4a p.574 (1981 Supp.)

Both parties argue for different reasons that the court should nonetheless entertain this appeal on the merits. Plaintiffs emphasize that they were not accorded due process since they did not have a full opportunity to present evidence and cross-examine witnesses who testified for the Town. Moreover, they do not believe they will receive a fair hearing before the Board. For its part, the Town points out that the Board actually conducted a full hearing and there is an adequate record upon which the court can review this matter; and it notes that Plaintiffs voluntarily absented themselves from the hearing.

Unlike the State Board of Property Tax Review under section 843(1-A) or the county commissioners in section 844, this court does not act to review these issues in a *de novo* capacity. Plaintiffs will have the opportunity to raise all relevant and appropriate issues before the Board, present their evidence, and, if warranted, appeal to this court in due course. Moreover, there is no basis in the record before the court to support Plaintiffs' subjective concerns about the forum. As for the Town's position, since the Board lacked jurisdiction to conduct the November 1, 2016 hearing, it is void.

## 2. Board Actions Relating to Other Years

Through their May 26, 2017 motion for leave to amend the complaint, plaintiffs requested that the court review "subsequent actions" of the Board related to this appeal and to tax assessments on their property in other years. In light of the liberal policy towards amendment requests in M.R. Civ. P. 15 and because it was difficult to determine from the pleading itself precisely what additional relief plaintiffs were requesting, the court granted the motion to amend with the understanding that "the issues will be

8

sorted out in the briefing and argument of this appeal." Order on Pending Motions & Amended Briefing Schedule at 2. It is now apparent that plaintiffs seek judicial review of Board actions concerning abatement requests based on the assessment dates of April 1, 2014 and April 1, 2016, as well as the Board's handling of an appeal from a decision of the Board of Selectmen relating to their "2013 to present" assessments. The Town argues that these additional challenges are untimely. (Def. Br. 8.)

Pursuant to 30-A M.R.S. § 2691(3)(G) and Rule 80B, a complaint for governmental review must be filed within 45 days of the date of the vote on a board of assessment review's original decision. 30-A M.R.S.A. § 2691(3)(G); M.R. Civ. P. 80B(b). In situations where a board entertains a motion for reconsideration, the appeal "must be made within 15 days after the decision on reconsideration . . . ." 30-A M.R.S.A. § 2691(3)(F). These statutory time limits are jurisdictional; if an appeal is untimely, the court lacks jurisdiction to hear it. *Paul v. Town of Liberty*, 2016 ME 173, ¶ 17, 151 A.3d 924; *Davric Me. Corp. v. Bangor Historic Track, Inc.*, 2000 ME 102, ¶ 11, 751 A.2d 1024. All of the additional appeals or requests for judicial review are untimely under these standards and the court is without jurisdiction to entertain them.

First, on June 9, 2015 the Board denied plaintiffs' abatement request based on the April 1, 2014 assessment date. (Def. Supp. R. 96-106.) Plaintiffs' request to review this decision of the Board through their June 1, 2017 motion to amend was effectively filed over two years after this decision. This request was untimely.

Second, on April 4, 2017 the Board issued its decision on plaintiffs' abatement request based on the April 1, 2016 assessment date. (Def. Supp. R. 140-167.) Plaintiffs requested reconsideration on April 25, 2017. On May 9, 2017 the Board voted to deny plaintiffs' motion to reconsider, and on May 11th sent a notice of this decision to the plaintiffs. (Def. Supp. R. 168-175.) Plaintiffs' motion to amend requesting review of this

9

denial was filed on June 1, 2017—beyond both the 45-day appeal period from the date of the original decision and the 15-day appeal period from the date reconsideration was denied. This request, too, was untimely.

Third, Plaintiffs filed an application under 36 M.R.S. § 841(1) with municipal officers (Town selectmen) alleging errors and irregularities in the Property's assessment for the years "2013 to present." The application was initially denied on December 13, 2016 and then subsequently presented to the Board, which denied it on January 31, 2017. (Def. Supp. R. 124-133.) Plaintiffs requested reconsideration. The Board scheduled a meeting for March 14, 2017 to address the request. (Def. Supp. R. 134.) Due to a snow storm the meeting was cancelled. (Def. Supp. R. 135.) Before the Board could meet to hear the request, the statutory period for reconsideration expired. *See* 30-A M.R.S. § 2961(3)(F). On March 20, 2017, the Board informed plaintiffs of its inability to reconsider its decision. (Def. Supp. R. 137-138.) Plaintiffs did not seek review of the Board's action until June 1, 2017 when the motion to amend was filed. This request, therefore, was also untimely.

Because the motion to amend was filed beyond these appeal periods and the claims brought therein raise entirely new issues that do not relate back to the particular claim in plaintiff's original complaint, they are untimely and the court lacks jurisdiction to review them. *See Richardson v. Inhabitants of Kittery*, No. CV-86-335, 1989 Me. Super. LEXIS 193, *3-5 (Sept. 13, 1989) ("In this case the plaintiffs' 1987 application to the Board was unrelated to their pending complaint. The 1987 Board ruling was not a modification of the 1986 decision triggered by a remand of the original complaint.") The amended claims did not relate back and were subject to the time requirements of Rule 80B, depriving the court of jurisdiction.

10

## Conclusion and Order

Because the Board lacked jurisdiction to conduct the November 1, 2016 hearing, plaintiffs' appeal is granted in part and the matter is remanded to the Board for hearing on plaintiffs' requested abatement with respect to the April 1, 2015 assessment date. Plaintiffs' requests for judicial review of the other Board actions are untimely and therefore denied.

Accordingly, the entry shall be: "Appeal granted in part. Kennebunk Board of Assessment Review's November 4, 2016 decision vacated. Remand for further proceedings consistent herewith. All other requests for judicial review dismissed for lack of jurisdiction."

The clerk may incorporate this Memorandum of Decision and Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

SO ORDERED.

DATED: April 20, 2018

_____
Wayne R. Douglas
Justice, Superior Court

**ENTERED ON THE DOCKET ON:** 4/23/18

11

STATE OF MAINE
YORK, SS.

SUPERIOR COURT
Civil Action
Docket No. RE-16-0037

TIMOTHY TIERNAN,

        Plaintiff,

    v.

THOMAS FEENEY and
MARY FEENEY,

        Defendants.

ORDER

Timothy Tiernan filed this action in March of this year against Thomas and Mary Feeney, his former in-laws, concerning property located in Lebanon, Maine. He contends that the Feeneys are not abiding by an agreement made years ago with regard to developing the property and allowing him to continue to reside there. Along with the complaint plaintiff filed a motion for ex-parte injunctive relief which sought to prevent defendants from evicting him from the property and then taking steps to sell it. The motion for ex parte relief was denied, and is now before the court as a motion for preliminary injunction seeking the same relief. Hearing on the motion was held on August 9, 2016. For the reasons that follow, the motion for preliminary injunction is granted in part and denied in part.

## I. Facts[1]

In 1998 Tiernan purchased a house and 60 acres of land at 30 Merchants Row in Lebanon, Maine. (Pl.'s Aff. ¶ 3.) Subsequently, he became disabled due to injuries and stopped working. Financial pressures, including his mortgage obligation, led him

---

[1] The factual record of the motion before the court consists of Mr. Tiernan's 3 ½ page affidavit; his non-verified complaint with three exhibits (photocopies of the 1998 deed, a

1

to approach his wife's parents, the Feeneys, about purchasing his property in order to avoid foreclosure. (Pl.'s Aff. ¶ 6; Def.'s Aff. ¶ 2.)

The Feeneys agreed to help. In 2007 the parties reached an agreement whereby the Feeneys borrowed $160,000[2] to pay off the balance of Tiernan's mortgage on the property as well as to pay him as additional $30,000 in cash; Tiernan deeded the property to the Feeneys; and Tiernan and his family remained living on the property. (Def.'s Aff. ¶ 3-4; Pl.'s Aff. ¶ 10.) To do this, the Feeneys had to take out a borrow the mortgage on their own home. (Def.'s Aff. ¶ 5.) The agreement entered into by the parties also involved a busness venture to develop the property and build houses for sale. (Pl.'s Aff. ¶¶ 8, 9, 11, 12, 13, 14; Def.'s Aff. ¶ 6.) Their agreement was not reduced to writing. Some terms are now in dispute.

According to Tiernan, Mr. Feeney, who had experience in these matters, would be in charge of building the houses. (Pl.'s Aff. ¶ 11.) The parties would share the net proceeds 50/50 from the venture. (Pl.'s Aff. ¶ 9.) When the land was developed, a new house for Tiernan would be built on the lot where the house is located, and he (Tiernan) would be entitled to live there. (Pl.'s Aff. ¶¶ 7-12.)

The Feeneys do not dispute that there was an agreement to develop the property. In fact, they subsequently invested an additional $40,000 in the venture to create and secure town approval of a subdivision plan. (Def.'s Aff. ¶ 6.) Tiernan and Mr. Feeney took other steps to further the plan, including meeting with contractors, completing a course in modular development, and visiting other sites. (Pl.'s Aff. ¶¶ 13-14.) Other aspects of the agreement are disputed, including whether Tiernan would

---

[2] Plaintiff contends that the agreed upon $160,000 purchase price represented 50% of the property's fair market value at the time. Apparently no appraisal was done. There is no other record evidence to corroborate Tiernan's valuation.

2

be entitled to retain the lot on which the house is located and remain living there in perptuity.

In the years that followed, circumstances changed substantially. The economy stalled and the housing market collapsed. As a result, the plan to develop the property faltered. The land was never subdivided; no houses were built. (Pl.'s Aff. ¶ 15; Def.'s Aff. ¶ 6.) Plaintiff and his wife divorced. (Pl.'s Aff. ¶ 16.) Tiernan and the Feeneys had a falling out. (Pl.'s Aff. ¶ 17.)

According to the Feeneys, the agreement had always required Tiernan to pay them half of the monthly mortgage payment. (Def.'s Aff. ¶ 7.) In the early years, before the Tiernans divorced, they had been making this payment to the Feeneys, although not every month. (Def.'s Aff. ¶ 8.) Tiernan confirms that such payments were made for a time; he has not made any payments for approximately six years. (Def.'s Aff. ¶ 9; *see also* Pl.'s Aff. ¶ 18.)

In 2010 there was a fire in the house on the property. The Feeneys submitted an insurance claim and received proceeds, which they used to pay down the mortgage. (Def.'s Aff. ¶ 10.) They did not share the proceeds with Tiernan (but he may have received other insurance proceeds from a claim on his damaged personalty). (Pl.'s Aff. ¶ 19; Def.'s Aff. ¶ 10.) Tiernan claims he repaired the fire damage to the house, using his own funds. (Pl.'s Aff. 19.) Tiernan still resides there, although the parties dispute the extent to which Tiernan has maintained the property and whether the house itself is even currenlty habitable or insurable. (*See* Def.'s Aff.¶¶ 14-15; Pl.'s Aff. ¶¶ 19, 21.)

In 2014 the Feeneys sold part of land to Central Maine Power Company (CMP), which had preexisting easement rights therein; he (Tiernan) did not receive a share of the proceeds. (Pl.'s Aff. ¶22.) The Feeneys concede that they did not share any of the proceeds with Tiernan but rather considered this to be a partial offset against the

3

monthly mortage payments plaintiff has refused to make in the last six years. (Def. Aff. ¶ 10.)

The current assessed value of the property is $220,000. (Pl.'s Aff. ¶ 23.) Defendants contend that this value reflects an increase due to the investment they made in securing town approval to subdivide and develop the property. (Def.'s Aff. ¶ 16.) They also contend that Tiernan has been harvesting timber on the property for sale without their permission. (Def.'s Aff. ¶ 13.)

At this point, the Feeneys are not in a position either to continue carrying the mortgage or to develop the property. They have had to refinance the mortgage on their own home again in order to keep up with payments on the Lebanon property. (Def.'s Aff. ¶ 13.) There have been efforts over the last several years to resolve their differences. Thus far those efforts have been unsuccessful. Through counsel at the hearing, the parties expressed continued interest in attempting to work this matter out. The Feeneys are merely looking to sell the property and unburden themselves of the debt. Tiernan, at the very least, wants to keep and remain living in the house on the property.

In August 2015 the Feeneys apparently received an offer from a third party to buy the property; the status of that offer is unclear. (Pl.'s Aff. ¶ 24.)

In February 2016 defendants served plaintiff with a 30-day notice to quit and filed a forcible entry and detainer (FED) action in Springvale District Court (SPR-SA-2016-0086). On April 29, 2016 the District Court (*Janelle, J.*) stayed the FED action pending ruling in this court on plaintiff's request for injunctive relief, which was filed in March 2016. (See Pl.'s Aff. ¶ 25.)

## II. Analysis

A preliminary injunction is a remedy in equity that serves to preserve the *status quo* pending trial. As with any equitable remedy, the court applies principles that require consideration of all surrounding facts and circumstances in order to determine what outcome is right and just as between the parties. *See Walsh v. Johnson,* 608 A.2d 776, 778 (Me. 1992).

In order to obtain a preliminary injunction, an applicant must establish that (A) there is a likelihood of success on the merits; (B) irreparable injury will ensue if the injunction is denied; (C) the threatened injury to the applicant outweighs potential harm to the other party if the injunction is granted; and, if relevant,[3] (D) an injunction will not adversely affect the public interest. *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.,* 2003 ME 140, ¶ 9, 837 A.2d 129; *Ingraham v. Univ. of Me. at Orono,* 441 A.2d 691, 693 (Me. 1982). The court must balance these factors, which are somewhat intertwined, in order to determine whether injunctive relief is warranted in the unique circumstances of each case. *Windham Land Trust v. Jeffords,* 2009 ME 29, ¶ 41, 967 A.2d 690; *see* Horton & McGehee, *Maine Civil Remedies,* § 5-3(d) at 107 (4th ed. 2004). The extent of the showing required to demonstrate a likelihood of success on the merits, for example, may vary from case to case depending upon strength or weakness of the other factors. If there is a strong showing of irreparable injury and a relatively low impact on the other party, an injunction may be justified even if the showing on likelihood of success on the merits is not particulalry strong. *See id.*

---

[3] The fourth factor—whether an injunction will adversely affect the public interest—does not appear to be a relevant or significant consideration in this case, and thus the court does not address it.

A. Likelihood of Success on the Merits

The complaint in this case sets out four causes of action: constructive trust (and equitable partition based thereon); unjust enrichment; breach of contract; and promissory estoppel. The limited factual record supporting this motion makes the determination of likelihood of success on any of these counts a close call, even as to the constructive trust claim, upon which plaintiff seems to most rely.

"[A] constructive trust may be imposed to do equity and to prevent unjust enrichment when title to property is acquired by fraud, duress, or undue influence, or is acquired or retained in violation of a fiduciary duty." *Gaulin v. Jones, 481 A.2d 166, 168 (Me. 1984); see also Baizley v. Baizley,* 1999 ME 115, ¶ 6, 734 A.2d 1117. Plaintiff has not demonstrated that the Feeneys acquired the property by fraud, duress, or undue influence. *Cf.* M.R. Civ. P. 9(b) (avermments of fraud or mistake "shall be stated with particularity") Rather, he appears to base his constructive trust claim on the assertion that the Feeneys stood in a fiduciary relationship to him stemming from a confidential relationship with Mr. Feeney.

A confidential relationship exists when "(1) 'an individual place[s] trust and confidence in' another and (2) there is 'a great disparity of position and influence in the relationship.'" *Albert v. Albert,* 2015 ME 5, ¶ 8, 108 A.3d 388 (*quoting Theriault v. Burnham,* 2010 ME 82, ¶ 6, 2 A.3d 324); *see also Morris v. Resolution Tr. Corp.,* 622 A.2d 708, 712 (Me. 1993); *Ruebsamen v. Maddocks,* 340 A.2d 31, 35 (Me. 1975). The existence of a confidential relationship is a question of fact. *Estate of Campbell,* 704 A.2d 329, 331 (Me. 1997); *Ruebsamen,* 340 A.2d at 35.

Plaintiff contends that he was in poor health, disabled and destitute at the time he entered into this arrangement. He turned to wife's parents, whom he trusted to help him avoid foreclosure and the resulting disruption to his family that would have

6

ensued. Further, he contends that the Feeneys stood in a disproportionately advantageous bargaining relationship to him because he was in dire straits and they had the resources and experience to undertake this venture.

As noted, this is a close question. The mere fact that the parties were family members does not necessarily demonstrate the level of trust and confidence required to establish a confidential relationship. *Albert,* 2015 ME 5, ¶6, 108 A.3d 388. Nor does the fact that they were entering into a business venture together, *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.,* 1999 ME 144, ¶ 20, 738 A.2d 839, or the fact that this undertaking was intended to protect against creditors or avoid foreclosure, *see Albert,* 2015 ME ¶ 13; *Moulton v Moulton,* 1998 ME 31, 707 A.2d 74. Just because the Feeneys were in a position to assist their daughter and plaintiff, and had the means and experience to do so, does not necessarily transform their relationship with plaintiff into a fiduciary one. At the same time, Tiernan did convey outright 60 acres of land to the Feeneys, and, based on the assertions before the court at this juncture, there may have been an expectation of gain beyond simply avoiding foreclosure, and if so, those expectations have been thwarted.

Even if plaintiff can establish a confidential relationship sufficient to support the imposition of a fiduciary duty, there still remains the question of unjust enrichment. The showing of unjust enrichment is a component of a constructive trust claim (and also has been plead as an independent ground for relief). The relevant facts appear to be as follows. The property is currently assessed at $220,000; however, its value at the time of the agreement is less clear, and the only record evidence of its value in 2007 is anecdotal. The extent of moneys defendants have expended or invested in the property appears to have been substantial, but this, too, is not fully clear from the record. It is undisputed that defendants retained the insurance proceeds from the fire

7

as well as the proceeds from the sale to CMP. Thus, there is a plausible basis for finding unjust enrichment, although it is unclear whether plaintiff will be able to sustain that finding on a more fully developed record.

The court, therefore, concludes that plaintiff has marginally demonstrated a likelihood of success on the constructive trust claim for purposes of this motion.[4]

### B. Irreparable Injury

Generally speaking, an injury is considered irreparable if it is one for which there is no adequate legal remedy. This typically means that recovery of damages alone would not be a sufficient or complete remedy for the wrongs asserted by the plaintiff. In the context of a motion for preliminary injunction, however, the potential for irreparable injury may be viewed not just in terms of whether there is an adequate, alternate legal remedy but rather whether the potential injury would be unrectifiable without an injunction were the plaintiff to prevail at trial. *See Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (Posner, J.)

Plaintiff satisfies this requirement in one limited respect. If defendants are allowed to sell the property while this action is pending and plaintiff were to prevail at final hearing, he would be unable to recover this particular property and the specific relief available via a constructive trust would be thwarted. The "concept of the uniqueness of a piece of real estate" is one that may support a showing of irreparable harm, depending upon the circumstances. Horton and McGehee, *Maine Civil Remedies*, § 5-5(b) at 104 (4th ed. 2004). Plaintiff is seeking through this action to reclaim his interest in this particular property. Conveyance of the property to a third party during the pendency of this action could render that relief unavailable, and would be

---

[4] In light of this conclusion, it is unnecessary to consider the likelihood of success with regard to the remaining claims.

unrectifiable. Available legal remedies would not be able to restore the property to him.

That is not the case with respect to plaintiff's attempt to maintain his current possession of the property and essentially use this action as a shield in the FED action. Plaintiff asserts that he would be irreparably harmed if forced to vacate the home in which he has resided for nearly 20 years. Eviction may be disruptive and difficult, but it does not amount to irreparable or unrectifiable injury. Possession can be restored if he ultimately prevails. Moreover, it is unclear whether defendants will be successful in their FED action.

Other than enjoining sale of the property pending the final outcome in this matter, plaintif has adequate remedies at law for any other potential injuries claimed.

C. Balance of Harms

In considering the impact of the requested injunction on the defendants, the court concludes that the full measure of relief sought by plaintiff would have an unjustifiably adverse impact on them. While plaintiff continues in possession, defendants remain financially and legally responsible for the property. They continue to bear the sole burden of paying the mortgage and taxes on the property, without assistance from plaintiff. It is alleged that plaintiff may be cutting and selling timber from the land, thus profiting himself while potentially depreciating the property's value. This action aside, if defendants have possessory rights to the property superior to plaintiff they ought to be able to assert those rights; and vice versa.

On the other hand, temporarily enjoining sale of the property impacts defendants less over the short run and preserves the potential for relief that plaintiff is seeking should he prevail. As a practical matter, it is unclear whether defendants

9

would be able to conclude a sale of the propety while this action is pending due to the uncertainty created by this lawsuit to clear title.

### III. Conclusions and Order

For the foregoing reasons, the court concludes that plaintiff is entitled at this point to limited injunctive relief. This order enjoins defendants from selling the property during the pendency of this action. This order does not enjoin defendants from proceeding ahead with the FED action pending in the Springvale District Court, and if awarded possession of the property in said action from taking possession and exercising any and all possessory rights thereto, including without limitation the right to lease the property to a third party.

Accordingly, it is hereby ORDERED as follows:

1. Plaintiff's motion for preliminary injunction is granted in part and denied in part, as set forth herein.

2. Pending further order of the court, defendants are enjoined from selling any interest in or to the property located at 30 Merchants Row in Lebanon, Maine.

3. As required by Rule 65(c) of the Maine Rules of Civil Procedure, plaintiff shall post security in the amount of $50,000 (or in any other amount agreed upon by the parties) for the payment of such costs and damages as may be incurred by defendants.

4. In all other respects, the motion for preliminary injunction is denied.

The clerk may incorporate this order upon the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

**SO ORDERED**

DATE:    August 30 , 2016

Wayne R. Douglas
Justice, Superior Court

10